**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ryan KREBS (83–1098), Bernard Levine
(83–1099), Defendants-Appellants.**

**Nos. 83–1098, 83–1099.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 12, 1985.

Decided April 18, 1986.

Rehearing and Rehearing En Banc
Denied June 6, 1986.

James E. Howarth (argued), Southfield, Mich., Jill Price, Detroit, Mich., for defendant-appellant in No. 83–1099.

Robert D. Luskin (argued), Onek, Klein and Farr, Washington, D.C. (Court-appointed), for defendant-appellant in No. 83–1098.

Joel M. Shere, U.S. Atty., Detroit, Mich., Ellen Dennis (argued), for plaintiff-appellee.

Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

This case involves a large-scale drug trafficking operation conceived and led by Nellie Bell Kassim. In the spring of 1980, Kassim developed a plan to conceal the illegal sale of prescription drugs behind a facade of apparent legitimacy. Kassim operated a succession of medical clinics specializing in the treatment of obesity, but the principal function of these clinics was to conceal several illegal drug activities. Included were the sale of individual prescriptions to clinic "patients" for their own use or for resale, the bulk sale of prescriptions for controlled substances to Detroit-area drug dealers, and the sale in Washington, D.C. and Detroit of large quantities of the controlled substances themselves, obtained through phony prescriptions.

On April 28, 1982, Ryan Krebs, a licensed medical doctor, and Bernard Levine, a licensed and registered pharmacist, and twenty-seven others were indicted by a federal grand jury in the Eastern District of Michigan and charged with distribution and intent to distribute numerous controlled substances in violation of 21 U.S.C. §§ 841 and 846. Nellie Bell Kassim was also

charged in a second count with conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848. Twelve defendants, including Kassim, entered a guilty plea prior to trial. Other defendants were dismissed. Ten defendants went to trial. The jury convicted four of the defendants, including Krebs and Levine, of the conspiracy. A mistrial was granted to one defendant. Five defendants were acquitted, three by the court and two by the jury. As to each convicted defendant, the jury entered a special verdict listing the specific drugs which that defendant had conspired to distribute and to possess with intent to distribute. Only Krebs and Levine appeal their convictions.

The primary issue raised by Krebs on appeal is whether his Sixth Amendment rights were violated because his counsel, Kenneth Robinson, had an actual conflict of interest which deprived Krebs of his right to effective assistance of counsel. Levine argues that he was prejudiced by the denial of his motion to sever and that severe prosecutorial misconduct deprived him of a fair trial. Prior to the indictment of the defendants in this case, Robinson had represented Kassim and had successfully represented Kassim's sister, Nancy McInnis, on drug distribution charges in Washington, D.C. in April 1981. McInnis had been arrested at National Airport with 9,000 Preludin tablets in her possession. According to the Washington, D.C. Metropolitan Police report, McInnis testified at her bond review hearing that she was "taking 10,000 Preludin tablets to the law offices of Kenny Robinson. She said that she was going to meet her sister, Nellie Bell [Kassim], at that location, and that she was going to turn the drugs over to Bell." Kassim testified as a defense witness at the McInnis trial.

Robinson represented Kassim during the conspiracy and for a brief time after her indictment in this action. After Robinson withdrew from representation of Kassim, he was retained by Krebs. Prior to trial of this case, the court ordered the government to file a memorandum listing all the conflicts of interest of which it was aware. In its memorandum of law regarding actual or potential conflicts of interest, the government noted that Robinson had previously represented Kassim. The government stated:

> Since Nellie Bell Kassim and Ryan Krebs, M.D. may have conflicting interests, and Kenneth Robinson may have confidential information from Nellie Bell Kassim and from Ryan Krebs, M.D., there is a potential conflict of interest with respect to both Nellie Bell Kassim and Ryan Krebs, M.D.

> Additionally, Kenneth Robinson represented Nellie Bell Kassim's sister, Nancy McInnis, in a trial conducted during April, 1981, in Virginia. In that case, Ms. McInnis was charged with possession with intent to distribute 9,000 Preludin (75 mg.). That allegation is now alleged as Overt Act # 33 of this conspiracy. Ms. McInnis is clearly a potential trial witness. Kenneth Robinson may have been given confidential information by Ms. McInnis as well as by Ryan Krebs, M.D. and Nellie Bell Kassim. His loyalties may be divided among Nellie Bell Kassim, Nancy McInnis, and Ryan Krebs, M.D.

Robinson filed an affidavit in which he stated that "based on the facts presented thus far by Ms. Kassim and Dr. Krebs there is no real or potential conflict. Neither person has ever admitted their guilt in this case or has implicated the other by statement or inference to counsel." Kassim and Krebs filed a joint affidavit. Krebs stated:

> I, RYAN KREBS, M.D., have read the above, know that Mr. Robinson previously knew Ms. Bell and others prior to knowing me and that any representation he previously had is waived as a conflict for any trial or appeal. I agree in the event that a court determines that Mr. Robinson has in fact previously represented Ms. Bell, then I still prefer and desire his representation in the instant case, I waive any conceivable—actual or potential—conflict.

On June 24, 1982, a hearing was held on the conflict issue. Robinson represented that he had discussed the potential conflict of interests issue with Kassim, Krebs and Kreb's wife, "not just whether there is a potential conflict but if in fact if one would crop up later on they can't raise on appeal or at trial...." The government adopted the position that because Robinson had previously represented Kassim and McInnis, he might not vigorously cross-examine them because of prior loyalties. The court addressed Krebs:

**THE COURT**: Dr. Krebs, have you heard all that has been said?

**DR. KREBS**: Yes, I have.

**THE COURT**: Are you aware that the 6th amendment of the United States Constitution guarantees you and every defendant in a criminal case the right to be represented by fully effective and fully loyal and conflict free Counsel?

**DR. KREBS**: I am aware of that.

**THE COURT**: Are you aware that if you cannot afford Counsel this Court will appoint Counsel for you?

**DR. KREBS**: Yes, I am.

**THE COURT**: And that you have a right to such appointment or a right to represent yourself if you see fit?

**DR. KREBS**: Yes, I have.

**THE COURT**: Are you aware of the maximum possible penalties that I have just described for the crime which you are accused, that is 15 years incarceration and 25 thousand dollars fine, as well as a three year special parole term and double penalty if there's is [sic] a prior drug conviction in your past?

**DR. KREBS**: I'm aware of that.

**THE COURT**: You have heard all of the allegations of the Government and your Counsel's responses thereto?

**DR. KREBS**: Yes.

**THE COURT**: And if there is potential conflict of interest in your Counsel, do you at this time waive the effective representation which he would have given you as a subject of appeal?

**DR. KREBS**: Yes, I do. I wish to retain Mr. Robinson.

**THE COURT**: And you realize that we can't know now what possible conflicts could develop in the course of the trial, particularly involving large numbers of people?

**DR. KREBS**: Yes, I do.

**THE COURT**: But you cannot raise this as an appeal—ineffective representation of Counsel on appeal.

**DR. KREBS**: I'm aware of it.

**THE COURT**: All right then.

The court also investigated the possibility of a conflict of interest arising from the representation by attorney Robert Cohn of five of the defendants. Cohn was himself a target of the investigation in this case. The court disqualified Cohn on the basis of an actual conflict of interest between and among the defendants represented by Cohn as well as between Cohn and the defendants. The court allowed Krebs to retain Robinson as his attorney.

Shortly after the June 24 conflicts of interest hearing, Kassim agreed to plead guilty and to testify for the government against the other defendants. The government did not inform defendants' counsel of this arrangement. The FBI conducted several "debriefing sessions" with Kassim; for some of the sessions FBI reports were prepared, but for other sessions they were not. Before trial Kassim made three significant allegations to the FBI involving Robinson. First, she alleged that Robinson had assured her that Daniel Lebby was not an undercover agent when Lebby had sought to become a bulk prescription buyer. FBI agents then interviewed Lebby. Secondly, in relation to the McInnis trial, Kassim stated at trial that she had told the FBI that Robinson had been aware that Kassim was bringing drugs to Washington and he had suggested ways to avoid being caught. Finally, Kassim alleged that Robinson had encouraged her to commit perjury at the McInnis trial.

On July 7, 1982, the court ordered the government to provide Jencks Act [1] materials to defense counsel no later than five days prior to trial. The court set August 9, 1982 as the motion cut-off date. On July 8, the court ordered the government to disclose all *Brady* material within fifteen days. The government released the Jencks Act material on September 8, 1982. On September 16, 1982, the day before trial began, Levine moved to sever under Fed.R. Crim.P. 14 based on the following allegations:

1) That the government failed to make timely disclosure of the fact that Kassim had become a government witness;

2) That the trial of McInnis was for possession of Preludin, and such possession was part of the conspiracy alleged in this case;

3) That Robinson had proffered testimony of Kassim at the McInnis trial which mentioned Robinson as "virtually having been a witness in the case;"

4) That the government failed to disclose the grand jury testimony of Thelma McCullough, an unindicted co-conspirator and government witness, that McInnis had been guilty and that Kassim had committed perjury at the McInnis trial with Robinson's knowledge.

Levine alleged that the new evidence from the Jencks Act materials clearly established a personal conflict of interest by Robinson, and that the government had violated the trial court's order to update the conflict of interest memorandum. The court denied the motion as untimely. Significantly, Robinson made a statement at the hearing on the motion to sever specifically indicating the possibility that Kassim might make incriminating remarks about him (Robinson) on the stand, adding that Krebs was "willing to waive that." Krebs was present in the courtroom when Robinson made the statement; Krebs remained silent.

At trial, the government contended that Krebs, as a member of the conspiracy, wrote prescriptions for controlled substances without a legitimate medical purpose. Krebs, a physician who was completing his residency at the University of Michigan, worked part-time at Kassim's clinics from the fall of 1980 until January 1982. Krebs' defense was that he was unaware that Kassim's clinics were not legitimate businesses. Similarly, the government alleged that Levine, as pharmacist and part owner of Scotch Castle Pharmacy, filled prescriptions either for individual patients who were referred to Scotch Castle by the staff at Kassim's clinics, or in bulk quantities for Kassim. The government maintained that Levine knowingly filled prescriptions written for controlled substances without a legitimate medical purpose. Levine's defense theory was that he did not know that any of the prescriptions he filled were invalid.

In opening statement, Robinson, Kreb's attorney, focused upon Nellie Bell Kassim and her ability to manipulate people; Robinson stated that "everything she does is a con." Robinson went into detail regarding his prior representation of Kassim, his representation of McInnis, and how he had been duped by Kassim. He stated:

> She [Kassim] says I knew about the perjury and put her up to it. But we'll show you right in front of the federal judge in Alexandria, Virginia when I felt Nellie Bell was committing perjury I told the judge she's been warned about the consequences of perjury. I say this to you— I'm not on trial, I hope—but I tell it to you because if Nellie Bell will lie for over a year and manipulate the lawyer that she's trying to get to help her get out of trouble, what will she do to a naive doctor who is twenty-nine, works part-time two days a week, who thinks he's helping people.

During cross-examination of Kassim, Robinson continually questioned Kassim about the circumstances surrounding the McInnis trial and about his prior represen-

1. 18 U.S.C. § 3500.

tation of her. Kassim accused Robinson of vouching for Danny Lebby, who wanted to buy bulk prescriptions. Robinson and Kassim engaged in a lengthy exchange regarding the fee he had been paid by Kassim for representing McInnis. An example of some of the extraordinary questions and responses elicited by Robinson on cross-examination regarding the McInnis trial include:

> Q. You're saying I rehearsed you on perjury and I got up in front of the judge and warned you about perjury?
>
> . . . .
>
> A. You told me what to say. After you rehearsed me for five hours, I should have had it pat.

Robinson confronted Kassim with the affidavit she had signed jointly with Krebs, in which she had stated that she had never told Robinson she was anything other than "totally innocent." Kassim repeatedly responded to Robinson's line of questioning: "You knew I was guilty." Kassim also stated that Robinson had told her to have Nancy McInnis pick the bags up at National Airport because law enforcement officers were not familiar with McInnis. McInnis, of course, was arrested and 9,000 Preludin tablets were found in the bags. Kassim claimed that she had 4,000 Dilaudid tablets in her possession at the time of McInnis's arrest, and the Dilaudid was for a sale that was to occur in Robinson's office:

> Q. [Robinson] Were they [the Dilaudid tablets] for me?
>
> A. [Kassim] Come on.
>
> Q. Are [sic] they for me?
>
> A. They was for a sale at your office. I don't know who was going to buy them.
>
> Q. Who was going to buy them?
>
> A. You told me to bring them.

> Q. Why didn't you try to come at me undercover?
>
> A. Well, at that time we was in cahoots together, almost.

The cross-examination testimony of Kassim is replete with accusations against Robinson. Throughout the trial, Robinson emphasized Kassim's accusations against *him* in an apparent attempt to establish Kassim's lack of credibility. Robinson challenged an FBI agent to expose any charges against him, and repeatedly referred to Kassim's allegations. In closing argument Robinson, in attacking Kassim's credibility, stated: "And if you do take her word not only does Dr. Krebs have trouble but some day I might too." Krebs was acquitted of conspiracy to possess with intent to distribute four of the eight charged controlled substances; he was convicted of conspiracy to possess with intent to distribute the other four charged controlled substances.

## I. CONFLICT OF INTEREST

Krebs' argument is that he was "burdened at trial with counsel laboring under grave and unmistakeable conflicts of interest that seriously undermined his performance." Krebs contends that Robinson was both a potential target of prosecution as well as a material witness to events charged in the indictment.[2] Krebs asserts that Robinson's performance deprived him of his Sixth Amendment right to effective assistance of counsel.

Krebs acknowledges that he signed an affidavit waiving his right to conflict-free counsel and that he reaffirmed this waiver at the June 24, 1982 hearing on the issue. He submits that his waiver was constitutionally deficient because it was not made with "sufficient awareness of the relevant circumstances and likely consequences."

---

2. Krebs' allegation that Robinson was a target of prosecution arises from the fact that a Drug Enforcement Agency agent and an FBI agent had twice questioned Daniel Lebby, whom Kassim alleged Robinson had vouched for when Lebby allegedly sought to purchase bulk prescriptions from Kassim and Krebs. Krebs' characterization of Robinson as a target of prosecution is an exaggeration; the record does not support the allegation that Robinson was actively being investigated as the trial proceeded. Similarly, Krebs contends that Robinson was a material witness because his testimony was relevant on numerous issues, including whether Krebs sold prescriptions to Lebby and on the question of Kassim's credibility and her ability to manipulate people.

*Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.") Krebs states that he found himself compromised by his attorney's conflicting interests only because the court and the government breached duties to address potential conflicts of interest of which they became aware. Krebs notes that the court's order of May 26, 1982 directing the government to prepare a memorandum concerning all known possible conflicts of interest explicitly imposed upon the government an obligation to "supplement [the report] on a continuing basis, with all such information which may become known to the government so long as this matter is before the court." Krebs submits that the government violated the May 26, 1982 order by failing to disclose that Robinson was allegedly an active participant in the illicit drug transaction that resulted in the arrest of McInnis in Washington, D.C., that he may have suborned perjury in her trial, that his fees for defending McInnis had been paid by Kassim, that Kassim had advised the government that Robinson had vouched for Lebby, and that Kassim had implicated Robinson in the transportation of drugs to Washington, D.C.

■ In support of his allegation that the court also breached its duty, Krebs correctly states that when a trial court becomes aware of a potential conflict of interest, it is obligated to pursue the matter even if counsel does not. *See United States v. Taylor,* 657 F.2d 92, 94 (6th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981); *United States v. La-Riche,* 549 F.2d 1088, 1095 n. 5 (6th Cir.), *cert. denied,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 383 (1977). Krebs contends that the court was aware before trial began that Robinson might be implicated in the conspiracy, and this knowledge gave rise to a duty of the court to explain to Krebs the implications of Robinson's conflicting interests.

■ For the purpose of deciding Krebs' appeal, we need not reach the issue of whether Robinson's representation of Krebs was adversely affected by an actual conflict of interest because we hold that Krebs made a knowing, voluntary and intelligent waiver of his Sixth Amendment right to conflict-free counsel. Even if the affidavit signed by Krebs was based on Robinson's representation that Kassim had never admitted guilt in the instant case, Krebs expressly waived "any conceivable—actual or potential—conflict." At the June 24, 1982 hearing, he expressed a desire to retain Robinson as his counsel, regardless of any possible conflicts that might develop in the course of the trial. Before the trial commenced, the government made available Jencks Act material which revealed that Kassim had become a government witness and also that allegations had been made that Robinson suborned perjury in the McInnis trial. The fact that Krebs was aware before trial began that Kassim might make accusations against Robinson is evidenced by Robinson's statement at the hearing on the motion to sever on the day before trial began:

> There's a possibility Ms. [Kassim] may give testimony about me whether or not I let her commit perjury. And I want to make it clear that anything that Ms. [Kassim] wants to say about me on the stand, is fine and Dr. Krebs will waive that as an issue. If Ms. [Kassim] wants to say I'm a drug runner, or I murdered my father, she can say anything she wants. I explained to Dr. Krebs and he's willing to waive that.

Krebs was present when Robinson made the above statement, yet he made no attempt to repudiate his prior waiver of "any conceivable—actual or potential—conflict." Krebs is a graduate of Stanford University and the University of Texas Medical School, and was completing his residency in internal medicine at the University of Michigan at the time of the indictment. Clearly, he possessed sufficient intelligence to comprehend the import of a waiver of "any

conceivable conflict," and to understand the significance of Robinson's representation to the court that, even though Kassim may make accusations against counsel, Krebs stood by his waiver.[3] In *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 468, 58 S.Ct. 1019, 1024, 82 L.Ed. 1461 (1938)), the Supreme Court stated that

> waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case including the background, experience, and conduct of the accused."

Here, the trial court alerted Krebs at the conflicts hearing that unforeseen conflicts of interest may arise during trial, and Krebs insisted that he wished Robinson to represent him. Later, at the hearing on Levine's motion to sever, Robinson represented to the court that he had discussed with Krebs the possibility that Kassim may make accusations against him (Robinson), yet Krebs was willing to "waive that as an issue." Krebs chose Robinson to represent him knowing that potential conflicts of interest existed. This court "has long recognized the accused's right to retain counsel of his choice." *Wilson v. Mintzes*, 761 F.2d 275, 279 (6th Cir.1985); *Linton v. Perini*, 656 F.2d 207, 208–09 (6th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982) (the right to counsel of one's choice is guaranteed by due process as well as the Sixth Amendment). Krebs exercised his Sixth Amendment right to counsel of choice and in so doing expressly made a knowing and intelligent waiver of his right to representation by conflict-free counsel. That Robinson's unusual trial strategy did not achieve the desired result of acquittal does not allow Krebs to now invoke the constitutional right which he chose to waive.

**3.** Krebs suggests Robinson's statement that "I explained to Dr. Krebs and he's willing to waive it" is ambiguous and could have referred to

## II. SEVERANCE

Appellant Levine contends that he was prejudiced by the denial of his Fed.R. Crim.P. 14 motion to sever his trial from that of Krebs. He argues that the untimeliness of the motion was attributable to government misconduct and the prejudice resulting from the denial was so extensive that his due process right to a fair trial was violated.

This was a proper case for joinder of offenses and defendants in a single indictment because the same conspiracy is involved in the charges against Krebs and Levine. Fed.R.Crim.P. 8. Even when joinder is permissible under Rule 8, the trial court must still determine whether the danger of prejudice warrants severance pursuant to Rule 14, which provides in part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires.

In *United States v. Dempsey*, 733 F.2d 392, 398 (6th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984), Chief Judge Lively wrote:

> This court may reverse a district court's denial of a motion for severance only for an abuse of discretion. *United States v. Frazier*, 584 F.2d 790, 795 (6th Cir.1978); *United States v. Behrens*, 689 F.2d 154, 159 (10th Cir.), *cert. denied*, 459 U.S. 1088, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982). As a general rule, especially in conspiracy cases, parties who are jointly indicted should be tried together. As the court stated in *United States v. Howell*, 664 F.2d 101, 106 (5th Cir.1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1641, 71 L.Ed.2d 873 (1982), while a district court may order separate trials in its discretion

waiver of evidentiary objections. We find this contention to be without merit.

if necessary to avoid prejudice, "the defendant has the heavy burden of showing specific and compelling prejudice resulting from a joint trial which can be rectified only by separate trials."

■ First, Levine acknowledges that his motion to sever on the eve of trial was made long after the August 9, 1982 motion cut-off date. He submits that his motion was timely, however, because the government failed to comply with the continuing court order to report any additional information concerning conflicts of interest.[4] Levine explains that through Kassim's debriefing statements, the government was aware of her accusations against Robinson, yet the government made no effort to inform either the court or the defendants of this potential conflict.

Moving to the merits of his argument, Levine states that the repeated allegations of Robinson's participation in the conspiracy, subornation of perjury and witness tampering distracted the jury from the relevant issues, bolstered the credibility of Kassim, the government's principal witness, and impugned the integrity of the judicial proceedings, thus violating his right to a fair trial. Levine notes that the trial took six weeks to complete and involved a massive amount of evidence. Levine urges that in light of the complexity of the trial and the nature and repetition of the accusations against Robinson, the jury inevitably was confused by Robinson's cross-examination of Kassim and distracted from the real issues. Further, Levine claims the fact that Kassim's credibility was bolstered by the exchanges between her and Robinson is evidenced by by the acquittal of Maggie Curry and John Zellner, both of whom were "exonerated" by

Kassim in her testimony, even though other witnesses implicated both Curry and Zellner. Levine submits that Kassim's bolstered credibility was prejudicial to him because she was the only witness who stated that he acted knowingly in filling the fraudulent prescriptions, and she was the only witness who explained tape recordings of Levine's phone conversations in a damaging manner.[5] Levine submits that severance would have been a judicially efficient and effective means of avoiding the prejudice resulting to him from Robinson's unorthodox trial tactics.

Levine has not made a sufficient showing of prejudice to establish that the district court abused its discretion. His allegations that Robinson's trial antics enhanced Kassim's credibility are undermined, as the government points out, by the fact that the jury convicted Shirley Danner, who was also "exonerated" by Kassim. Further, the testimony of Thelma McCullough and Sidney Brickner implicated Levine personally, and Johnnie Mae Hicks implicated Scotch Castle Pharmacy in the conspiracy. The government introduced into evidence the wire intercepts and Levine's prescription records and records of his wholesale controlled substance orders.[6] The jury convicted Levine of conspiracy with regard to only three of the eight charged controlled substances. Apparently, the jury was able to "compartmentalize the evidence as it related to separate defendants in light of its volume and the limited admissibility." *United States v. Thomas*, 728 F.2d 313, 319 (6th Cir.1984), (quoting *United States v. Gaines*, 563 F.2d 1352, 1355 (9th Cir.1977)). Accordingly, we find that

---

**4.** We do not consider the timeliness of the motion crucial to the resolution of this issue. The government's failure to update the conflicts of interest memorandum is addressed *infra* in the discussion of prosecutorial misconduct.

**5.** The wire intercept revealed that Levine frequently called Kassim's clinic. On one occasion he told L.C. Thurman, a clinic employee, that "he didn't have any" and "come back and I'll give it back to you." Another time he told an employee to tell Kassim that he was "expecting

some" and Kassim could bring thirty prescriptions a day but he was going to have to "put labels on every bottle."

**6.** The government produced a witness who testified that Scotch Castle Pharmacy had placed so many orders for an excessive amount of Preludin that the wholesaler, Generic Drug Company of Hollywood, Florida, finally refused to fill any more of Scotch Castle's orders.

the trial court did not abuse its discretion in refusing to order separate trials.

## III. PROSECUTORIAL MISCONDUCT

Levine argues that certain acts of misconduct by the prosecution, taken in their totality, deprived him of a fair trial. Specifically, Levine points to the following:

1. The failure of the government to update the conflicts of interest disclosure order when it became aware of Kassim's allegations against Robinson.

2. The government deliberately failed to preserve evidence in that the United States Attorney's office directed the FBI not to prepare standard 302 investigation reports, used in connection with the debriefing of witnesses, on some of the interviews with Kassim.

3. The failure of the government to make a timely disclosure of *Brady* material. *Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963). On the final day of Levine's case-in-chief, the government disclosed for the first time that an undercover agent had worked for a short time at Scotch Castle Pharmacy and had not seen any illegal activity.

4. The prosecution deliberately elicited inadmissible testimony in violation of a court order. Arthur Hayes, a witness, was inadvertently allowed to listen to trial testimony in violation of a sequestration order. The court ruled that Hayes could still testify, but that his testimony would be limited to the facts contained in a prior statement he had made. That statement did not refer to Scotch Castle Pharmacy; nevertheless, the prosecution elicited testimony from Hayes that Scotch Castle Pharmacy had filled his illegal prescriptions.

5. The government improperly vouched for the credibility of Kassim, based upon remarks by the Assistant United States Attorney in closing argument to the effect that Kassim had told the truth in her testimony because she had no motive to lie.[7]

The government, in response to Levine's first allegation, states that Kassim did not make accusations against Robinson in her initial debriefing sessions, but made the accusations at later sessions. The government suggests that it did not update the conflicts of interest memorandum because it did not take the allegations seriously. Nonetheless, the court order placed a continuing obligation upon the government to update the memorandum; it was the function of the court, not the prosecution, to determine whether Kassim's accusations evidenced a conflict of interest. The government urges that any failure to disclose on its part would not require reversal of Levine's conviction.

The government next addresses Levine's allegation that it subverted the Jencks Act by not requiring FBI 302 reports for every witness interview. The reason given at trial for the failure of the FBI to comply with its standard procedure was that the reports were not prepared in an effort to save time. The Jencks Act requires the government to disclose to the defense prior statements of a witness. The government submits that the Jencks Act does not require the taking of notes or the preparation of FBI 302 reports, but requires only that if such notes or reports do exist, the government must disclose these prior statements to the defense. In this case, not only did the FBI not prepare 302 reports on some witness interviews, but the government failed to provide defense counsel with all of the handwritten notes from Kassim's interviews until the existence of such notes was revealed by an FBI agent's testimony at trial.

---

7. Levine also claims that the prosecution intentionally elicited an inadmissible hearsay identification of "Bernie" as the person who filled illegal prescriptions. The transcript shows that the witness's mention of "Bernie" was not in response to any question by the prosecution, but was blurted out by the witness after a hearsay objection by the defense counsel.

Next the government turns to Levine's assertion that it failed to make timely disclosure of *Brady* material. The government acknowledges that it failed to inform Levine's counsel until near the conclusion of the presentation of his defense that an undercover agent worked at Scotch Castle Pharmacy for two days and never saw Levine engage in illegal activity. At trial, the government stipulated that an undercover officer worked at the pharmacy on August 19 and 20, 1980, and never observed Levine filling multiple prescriptions. The parties further stipulated that Levine's counsel was not provided with this information until that morning. The stipulation was read to the jury. The government offered to make the undercover agent available as a defense witness, but Levine declined. In closing argument, Levine's counsel referred to the failure of the undercover agent to observe any illegal activity. When asked at oral argument why the government failed to make timely disclosure of this information, the Assistant United States Attorney replied: "We forgot." The government submits that the disclosure did not come too late to deprive Levine of a fair trial, and the untimely disclosure was rendered harmless by the stipulation read to the jury and by Levine's closing argument.[8]

 Levine's next complaint is that the government improperly elicited from Arthur Hayes the statement that he had taken prescriptions to Scotch Castle Pharmacy. The trial court considered this an intentional violation of its order limiting Hayes' testimony to his prior statement, which contained no mention of Scotch Castle Pharmacy, and struck Hayes' entire testimony. We are inclined to agree with the trial court that Hayes' response was intentionally elicited by the prosecution's open-ended question: "Do you remember any other places she [Kassim] told you where to go?" We also find merit in Levine's

contention that the failure to timely disclose this *Brady* material obstructed his ability to prepare for trial and undermined his ability to present his theory of defense.

Finally, we turn to Levine's allegation that the government improperly vouched for the credibility of Kassim by suggesting to the jury in closing argument that Kassim had told the truth. The government urges that such statements were permissible because Kassim's credibility had repeatedly been attacked by the defense. A United States Attorney, as representative of a sovereignty, not only has the responsibility of prosecuting with vigor, but "[i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). United States Attorneys are "held to a higher standard of behavior" than other attorneys. *United States v. Young*, — U.S. —, 105 S.Ct. 1038, 1052, 84 L.Ed.2d 1 (1985) (Brennan, J., concurring in part, dissenting in part). This court has often stated that "it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant." *United States v. Daniels*, 528 F.2d 705, 709 (6th Cir.1976).

 The Assistant United States Attorney made the following statements in her closing argument: "But I want to suggest to you that in this trial testimony she [Kassim] was telling the truth.... Basically, she had no reason to lie," and "she is basically telling the truth in this case because she had no reason to lie...." Although the prosecutor's statements "I want to suggest...." arguably may not express a personal opinion, *see United States v. Stulga*, 584 F.2d 142 (6th Cir. 1978) (Prosecutor's use of the words "I

---

**8.** The government suggests that the *Brady* material in question was not admissible evidence, citing *United States v. Qaoud,* 777 F.2d 1105 (6th Cir.1985) (certain negative exculpatory evidence found to be inadmissible). Whether or not the evidence was properly admissible is relevant to the question of whether the outcome of the trial was materially affected, but inadmissibility does not excuse prosecutorial misconduct.

submit" is not equivalent to "I believe"), the effect of the two statements when considered together can be "reasonably construed to be based on personal belief...." *United States v. Bess*, 593 F.2d 749, 756 (6th Cir.1979). In the instant case, defense counsel objected to the prosecuting attorney's statements, and the trial judge responded that it would cause additional harm if she told the jury the prosecutor had "no business saying she told the truth."

■ We are convinced that several instances of prosecutorial misconduct occurred in the trial of this action. "To warrant a new trial, however, prosecutorial misconduct 'must be so pronounced and persistent that it permeates the entire atmosphere of the trial.' *United States v. Lichenstein*, 610 F.2d 1272, 1281 (5th Cir.), *cert. denied sub nom., Bella v. United States*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980), quoting *United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir. 1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978)." *United States v. Thomas*, 728 F.2d at 320. We must determine whether, in the exercise of our supervisory powers, Levine's conviction should be reversed because of the improper conduct of the prosecutor. "In making this determination we consider whether on this record the misconduct can be said to be harmless," *United States v. Leon*, 534 F.2d 667 (6th Cir.1976), and we so conclude.

Although the wire intercepts were susceptible of multiple interpretations, other evidence demonstrates that Levine knowingly participated in the conspiracy. The evidence established that he ordered excessive amounts of Preludin and Talwin, and that he filled controlled substance prescriptions presented in bulk. Testimony established that Levine charged amounts substantially over the regular retail price to fill prescriptions prescribed by doctors from Kassim's clinics. Kassim testified that Levine filled multiple prescriptions for Preludin and other controlled substances for her on numerous occasions. Sidney Brickner testified that while he was a

Scotch Castle employee he observed Levine accept 20–30 Preludin prescriptions at one time. Thelma McCullough testified that she filled multiple controlled substance prescriptions obtained from Kassim's clinic at Scotch Castle Pharmacy on numerous occasions.

Although we think that the conduct of the prosecutor in this case was inexcusable, we do not find the facts present a clear and compelling case for reversal given the substantial evidence of guilt and the efforts of the trial court to take corrective measures to eliminate the resulting prejudice.

Accordingly, the convictions of Krebs and Levine are affirmed.

WELLFORD, Circuit Judge, concurring.

I agree entirely with Judge Peck's analysis and conclusion in this case as to defendant Krebs. I write separately with regard to part III of the decision pertaining to prosecutorial misconduct and defendant Levine. The failure of the United States Attorney to furnish Levine's counsel with all the handwritten F.B.I. notes from interviews with key witness Kassim is, in and of itself, at least a disturbing oversight. When one couples that with the failure without any adequate explanation to make a timely and appropriate *Brady* disclosure that an undercover agent worked at Levine's pharmacy and observed no illegal activity on his part, this conduct becomes more disturbing. In addition, moreover, there was the questioning of witness Hayes in a fashion that brought forth testimony exceeding the bounds of a prior limiting order. The trial court struck this testimony and therefore cured to a considerable extent any resulting prejudice to Levine. Finally, as noted by Judge Peck, there was the questionable "vouching" for the credibility of witness Kassim in closing argument by the prosecutor.

These actions, in combination, cause one serious concern with respect to the contention of defendant Levine that he did not receive a fair trial. Although the question is a close one, I concur with the conclusion that the actions of the trial court were

sufficient, but barely sufficient, to overcome these shortcomings and the negligent conduct of the prosecution. Despite these problems I believe Levine had a reasonable opportunity to present his case to the court and jury, and that there was substantial evidence of guilt to warrant the verdict finding Levine guilty as charged.

I would therefore also affirm as to defendant Levine but with some considerable trepidation.