66 F.3d 326
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carl HILL, Defendant-Appellant.
 No. 94-4051.
 United States Court of Appeals, Sixth Circuit.
 Sept. 21, 1995.
 
 Before: JONES, GUY, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Carl Hill, a/k/a "Zulu," is appealing his conviction and sentence for conspiracy to possess with intent to distribute over fifty grams of cocaine base in violation of 21 U.S.C. Sec. 846. Hill claims that his conviction was obtained as a result of prosecutorial misconduct, and he challenges his sentence based on factual and constitutional grounds. We affirm Hill's conviction and sentence.
 
 I.
 
 2
 As a result of a federal task force investigation, the following evidence was submitted at trial. In March 1990, Defendant Hill recruited his half-brother Carl George and others to come to Steubenville, Ohio, for the purpose of selling cocaine base ("crack"). Hill also recruited another half-brother, Yancy George, to act as an enforcer for Hill's crack business in Steubenville.
 
 
 3
 The crack was sold initially in the streets and outside bars such as the American Legion and Fannie's; see J.A. at 207. Hill would give each recruit bags containing ten rocks of crack cocaine, worth approximately $250. After the recruits would sell the rocks, they would return the money to Hill, who in turn would give them another bag of crack to sell. After selling the initial supply of crack cocaine, Hill and the Georges returned to Detroit, Michigan, to restock.
 
 
 4
 In April 1990, Hill and the Georges returned to Steubenville "for a two-week spree selling crack cocaine. As before, Hill would give the Georges and others bags of crack cocaine to sell. Soon, Hill met two women, Michelle Sims and Cathy Carrington, who at the time were residing on North Seventh Street in Steubenville. Two weeks after meeting Hill, these women allowed Hill and his associates to begin selling crack from their home at 905 N. Seventh Street. Numerous people sold crack from that house. Hill instructed Sims on how to cut the crack and the price to charge, and he authorized the people who would be allowed to distribute the contraband for him. Hill and the Georges supplied the crack for sale at the house.
 
 
 5
 Carl George purchased two guns in April or May of 1990, one for himself and one for Hill. They kept the guns at Sims' residence for the protection of the drugs and the drug proceeds. Hill told Carl George and the others that he did not want them to carry the guns and that they should be left inside Sims' residence.
 
 
 6
 After Sims was evicted from her Seventh Street dwelling, she moved to Fourth Street in Steubenville and continued selling crack for Hill. Hill instructed Sims and others to take the drug proceeds to the home of his girlfriend, Lisa Gilbert. When Sims ran low on crack, she would inform Gilbert, who would then contact Hill for a fresh supply. Sims estimated that they sold thousands of dollars of crack cocaine each week from her Fourth Street location.
 
 
 7
 In July, Hill and Sims moved the crack operation to Marilyn White's home on Fourth Street in Steubenville. Two or three times a day, Sims and others would take the drug proceeds to Lisa Gilbert's house and receive $500 packages of crack cocaine in exchange. As always, Hill supplied Gilbert with the crack cocaine. Sims also accompanied Hill on trips to Detroit for the purpose of procuring more crack for sale in Steubenville. Hill usually travelled to Detroit two or three times per week. Moreover, Sims observed Hill with a firearm on two separate occasions. Hill told her that he carried the weapon for security reasons.
 
 
 8
 In July 1990, Carl George and Hill opened another crack house on Eighth Street in the residence of Tamara Toudle. Hill would pick up the profits from the sales of crack and drop off new supplies three to six times each day. Approximately $2,000 worth of crack cocaine was sold from that location each day. In October 1990, Toudle moved to a new location on Fourth Street, and along with others, she sold crack cocaine for Hill from this location until May 1991. Toudle saw Hill and others with guns at her residence. This new location on Fourth Street continued to produce thousands of dollars in crack sales each day.
 
 
 9
 Several people also purchased crack directly from Hill, including Yolanda McGee, Robin Parrish, Carmalita Barker, and Rhonda Washington.
 
 
 10
 Prior to Hill's trial, both Carl George and Yancy George entered into plea agreements with the government, and at Hill's trial they both testified on behalf of the government against Carl Hill. Hill was ultimately found guilty of conspiracy to possess with intent to distribute over fifty grams of crack cocaine.
 
 
 11
 After Hill's conspiracy conviction, the district court held a sentencing hearing to consider Hill's six objections to the Presentence Investigation Report: (1) the probation department's calculation that Hill's relevant conduct included 4.39 kilograms of cocaine base; (2) the two-level enhancement for use of a firearm; (3) the four-level enhancement based on Hill's role in the offense; (4) the determination that the criminal history category for Hill was II; (5) the constitutionality of the penalties for cocaine base; and (6) the disparity between the proposed sentence for Hill and the sentences imposed on his co-conspirators. The district court sustained Hill's first and third objections. The court reduced Hill's relevant conduct to 56.7 grams of cocaine base and lowered the enhancement for his role in the offense to two levels instead of four. The remaining objections were overruled. Based on an offense level of 36 with a criminal category history of II, the court sentenced Hill to 210 months of imprisonment, which was the minimum term under the applicable guideline range. Hill was also ordered to serve a five-year term of supervised release. This appeal followed.
 
 II. Sentence Disparity
 
 12
 Hill first claims that his 210-month sentence is excessive and constitutes cruel and unusual punishment in violation of the Fifth, Sixth, and Eighth Amendments because of the disparity between sentences based on cocaine base as opposed to cocaine powder. The Sentencing Guidelines prescribe the same base offense level for one gram of cocaine base as for one hundred grams of cocaine powder, see USSG Sec. 2D1.1(c)(11), and Hill contends that this 100:1 ratio is unconstitutional because it bears no relation to the severity of the crime and has a disparate impact on African Americans.[1] In the alternative, Hill contends that based on these disparities this court should at least permit the district court to consider whether a downward departure from the "draconian" sentence mandated by the guidelines would be appropriate.
 
 
 13
 "A defendant's challenge to his sentence on constitutional grounds presents a question of law over which this court should exercise de novo review." United States v. Lloyd, 10 F.3d 1197, 1220 (6th Cir.1993), cert. denied, 115 S.Ct. 219 (1994).
 
 
 14
 Contrary to Hill's first contention, the constitutionality of the specific sentencing guideline in question, USSG Sec. 2D1.1, is well-settled in this circuit. Indeed, this court previously has upheld section 2D1.1 against constitutional challenges based on due process, equal protection, and the Eighth Amendment. See Lloyd, 10 F.3d at 1220 (equal protection and due process); United States v. Tinker, 985 F.2d 241, 242 (6th Cir.1992) (due process and equal protection), cert. denied, 113 S.Ct. 1872 (1993); United States v. Pickett, 941 F.2d 411, 418-19 (6th Cir.1991) (due process and Eighth Amendment).
 
 
 15
 Furthermore, this court in Pickett stated that the 100:1 ratio was not a sufficiently unusual circumstance to justify a downward departure and noted that the drafters of the Sentencing Guidelines were concerned that the special attributes of crack--its small size and cheap price per dose--among others, could uniquely create societal problems, which warranted the different sentence. Pickett, 941 F.2d at 418. Accordingly, Hill's constitutional challenge to section 2D1.1 is not well-taken, and the sentencing disparity between cocaine base and cocaine powder does not justify a downward departure from the applicable sentencing guideline range.
 
 
 16
 Hill also contends that his sentence is grossly disproportionate to the sentences imposed on Codefendants Carl George and Yancy George in violation of his Sixth Amendment right to a trial by jury and the Eighth Amendment prohibition against cruel and unusual punishment. For participation in the same conspiracy, Hill notes that he received a sentence of 210 months while his fellow participants in the same conspiracy, Yancy George and Carl George, who entered into plea agreements and cooperated with the government against Hill, received four-month and twenty-month sentences, respectively. Hill claims that "[s]uch a vast disparity in sentences, based upon [the] exercise of his right to a trial by jury, is illogical, unjust and unwarranted." Hill Br. at 14.
 
 
 17
 This circuit has stated, however, that where there is some basis for disparity among the sentences of defendants with similar records found guilty of similar conduct, uniformity of sentences is not appropriate. United States v. Rutana, 932 F.2d 1155, 1159 (6th Cir.), cert. denied, 502 U.S. 907 (1991). Furthermore, this circuit has held that it is not proper for a court to depart downward for the sole purpose of harmonizing a sentence with that of a codefendant with dissimilar conduct and role in the offense. United States v. Parker, 912 F.2d 156, 158 (6th Cir.1990); United States v. Romano, 970 F.2d 164, 167 (6th Cir.1992).
 
 
 18
 In this case, a number of different factors justified any perceived disparity. Yancy and Carl George pled guilty to conspiracy to distribute over five grams of crack cocaine, while Hill was convicted of conspiracy to distribute over fifty grams of crack cocaine. Both Yancy and Carl George entered into plea agreements with the government, provided information to the government, and testified at Hill's trial. As a result of those agreements and their cooperation, the Georges received the benefits of downward departure motions and a reduction because of acceptance of responsibility. Also, their relevant conduct determination was limited by the application of USSG Sec. 1B1.8(a), which prohibits the use of information which the government obtains from cooperative defendants in determining the sentencing range for those defendants. Neither of the Georges received enhancements for the use of a firearm or his role in the offense. By contrast, Hill chose not to enter into a plea agreement with the government, not to cooperate, not to accept responsibility, and not to provide substantial assistance to the government. Also, Hill did not cooperate with the government so as to avail himself of the benefit of USSG Sec. 1B1.8. Further, the record clearly indicated Hill's extensive leadership role in the drug conspiracy.
 
 
 19
 In light of these substantive differences, Hill's argument that his sentence was either disparate or unfair in comparison to those of his codefendants is meritless.
 
 
 20
 III. Sentence Enhancement for Possession of Firearm
 
 
 21
 Next, Hill argues that the district court's finding that he possessed a firearm while engaged in drug activities and the court's two-level enhancement of his sentence pursuant to USSG Sec. 2D1.1(b)(1) were clearly erroneous and deprived him of due process under the Fifth Amendment.
 
 
 22
 Currently, section 2D1.1(b)(1) of the Sentencing Guidelines states that if the defendant possessed a dangerous weapon during a drug trafficking offense, then the offense level should be increased by two levels. The district court has discretion under the preponderance of the evidence standard to enhance a defendant's sentence for possession of a firearm during a drug-trafficking offense. United States v. Hodges, 935 F.2d 766, 770 (6th Cir.), cert. denied, 502 U.S. 889 (1991). Moreover, this court has stated that a gun enhancement is proper where it is reasonably foreseeable to a defendant that his co-conspirator would possess a gun in connection with the drug offense. United States v. Perkins, 994 F.2d 1184, 1192 (6th Cir.), cert. denied, 114 S.Ct. 279 (1993). When the district court finds such possession by a preponderance of the evidence, it should enhance a defendant's sentence for possession of a firearm during a drug-trafficking offense. United States v. Sivils, 960 F.2d 587, 596 (6th Cir.), cert. denied, 113 S.Ct. 130 (1992).
 
 
 23
 At the trial in this case, the government produced abundant evidence to show both that Hill used firearms in connection with the drug conspiracy and that Hill could be held accountable for the possession of weapons by other members of the conspiracy. Given the wealth of evidence to support the district court's decision to enhance the sentence pursuant to USSG Sec. 2D1.1(b)(1), we find that the district court's conclusion was not clearly erroneous.
 
 IV. Prosecutorial Misconduct
 
 24
 Finally, Hill claims that his conviction was obtained as a result of prosecutorial misconduct during the government's presentation of evidence and during the government's closing argument. During the presentation of evidence, Hill contends that the government consistently elicited testimony concerning the presence of weapons, which was both irrelevant and inflammatory. Also during closing argument, Hill alleges that the government appealed to the passions and fears of the jury to seek his conviction based on the fear of crack cocaine and its effects on individual users and society in general. Moreover, during closing argument, Hill claims that the government personally attacked defense counsel for his conduct of the trial.
 
 
 25
 After carefully reviewing Hill's prosecutorial misconduct allegations, we are convinced that even if we assume that some of the prosecutor's conduct was improper, it did not rise to the level of reversible error. See generally United States v. Carroll, 26 F.3d 1380 (6th Cir.1994) (discussing standards for determination of reversible error).
 
 V.
 
 26
 Based on the foregoing analysis, we AFFIRM both the conviction and sentence of Hill.
 
 
 27
 NATHANIEL R. JONES, Circuit Judge, concurring.
 
 
 28
 Although I concur in the result of this case, I write separately to emphasize two fundamental concerns.
 
 I. Sentencing Disparity
 
 29
 First, I note my affinity for Hill's challenge to section 2D1.1 of the Sentencing Guidelines, particularly the delineated disparity between sentences involving cocaine base ("crack") and those involving cocaine powder. Despite binding precedent on this issue, I have long questioned the policy rationale behind this specific sentencing provision because it prescribes the same offense level for one gram of cocaine base as for one hundred grams of cocaine powder. See USSG Sec. 2D1.1(c)(11).
 
 
 30
 Recently, at the direction of Congress, the United States Sentencing Commission studied federal sentencing policy as it related to the possession and distribution of all forms of cocaine. See U.S. Sentencing Commission: Executive Summary of Special Report on Cocaine and Federal Sentencing Policy, 56 Crim.L.Rep. (BNA) 2159, 2159 (March 1, 1995) [hereinafter Executive Summary ]. "Specifically, Congress directed the Sentencing Commission to report on the current federal structure of differing penalties for powder cocaine and crack cocaine offenses and to provide recommendations for retention or modification of these differences." Id. The Sentencing Commission submitted its report to Congress on February 28, 1995, the Special Report to Congress: Cocaine and Federal Sentencing Policy, and on May 1, 1995, the Sentencing Commission submitted to Congress proposed amendments to the Sentencing Guidelines, which were consistent with the recommendations in the Commission's earlier report, see Amendments to the Federal Sentencing Guidelines, Policy Statements, and Official Commentary, 57 Crim.L.Rep. (BNA) 2095 (May 10, 1995) [hereinafter Amendments ].
 
 
 31
 Based on its study, the Sentencing Commission discovered a number of troubling concerns with the present 100:1 sentencing differential. Two are particularly noteworthy. First, the Commission found a significant disparity in terms of the race of those most affected by the enhanced penalties associated with crack cocaine. The Commission stated, "Federal sentencing data leads to the inescapable conclusion that Blacks comprise the largest percentage of those affected by the penalties associated with crack cocaine." Executive Summary, supra, at 2168. The data revealed that Blacks accounted for 88.3% of federal crack cocaine distribution convictions in 1993, Hispanics 7.1%, Whites 4.1%, and others 0.5%. Id. at 2167. The racial breakdown for powder cocaine distribution offenses sentenced in 1993 was much different: 32% White, 27.4% Black, 39.3% Hispanic, and 1.3% other. Id. at 2167-68. Although the Commission found no evidence that Congress or the Sentencing Commission acted with discriminatory intent in setting the different statutory and guideline penalties for the different forms of cocaine, the disparate impact of the penalties, as revealed in the data, was "a matter of great concern" to the Sentencing Commission. Id. at 2168. Such disparities are consistent with a general trend wherein the average sentence for black drug offenders is 93% higher than the average sentence for their white counterparts. Barbara S. Meierhoefer, The Role of Offense and Offender Characteristics in Federal Sentencing, 66 S.Cal.L.Rev. 367, 390 (1992), cited in Nathaniel R. Jones, For Black Males and American Society--The Unbalanced Scales of Justice: A Costly Disconnect, 23 Cap.U.L.Rev. 1, 14 (1994). The Commission concluded that in order to justify a penalty differential that has such a severe impact on a particular minority group, sufficient policy bases would have to exist.
 
 
 32
 Second, the Commission noted another anomaly created by the current penalty differential: a low-level retail dealer of crack is punished far more severely than the powder cocaine supplier, who may have sold the powder cocaine from which multiple street dealers made crack. The Commission provided an excellent example of this dilemma:
 
 
 33
 [U]nder the 100-to-1 quantity ratio, a wholesaler convicted of moving five kilograms of powder cocaine may receive a lesser sentence than a distributor who buys one of the five kilograms but is caught after having converted the powder into crack cocaine. This anomalous result highlights the fact that individuals higher in the cocaine distribution chain can be punished less severely than certain lower-level traffickers because of the intervening change in the form of cocaine, i.e., the change to crack.
 
 
 34
 Id. at 2169.
 
 
 35
 Although the Commission recognized the presence of some pharmacological differences between the two forms of cocaine and the presence of societal concerns that lent some justification to the penalty differential, the Commission concluded that "sufficient policy bases for the current penalty differential d[id] not exist." Amendments, supra, at 2097.[1] Thus, on May 1, 1995, the Sentencing Commission proposed to Congress an amendment of USSG Sec. 2D1.1 that would eliminate the 100:1 sentencing disparity between crack cocaine and powder cocaine in the current guidelines. See id. at 2096. In other words, the Sentencing Commission's proposed amendment is clearly consistent with the position that Hill has advocated on appeal, and I applaud the change.
 
 
 36
 Nevertheless, the proposed amendments do not become effective, assuming that Congress does not act to change them, until November 1, 1995. See id. at 2095. This fact precludes Hill from reaping the benefit of the amendment to section 2D1.1(c) because this court has held, consistent with the direction of Congress, that a district court must apply the Guidelines in effect at the time of sentencing. United States v. Nagi, 947 F.2d 211, 213 n. 1 (6th Cir.), cert. denied, 504 U.S. 958 (1992)); 18 U.S.C. Sec. 3553(a)(4); USSG Sec. 1B1.11(a). Obviously, the district court sentenced Hill under the current guidelines, which contain the penalty differential, prior to November 1, 1995. Therefore, even though the Sentencing Commission has adopted the position, with regard to USSG Sec. 2D1.1(c), that Hill has espoused before this court, both federal law and prior precedent will prevent the application of the amended guideline to him.[2]
 
 II. Prosecutorial Misconduct
 
 37
 Although I concur in the court's conclusion that the prosecutor's conduct in this case, specifically some of his comments in closing argument, did not constitute reversible error, I cannot overstate the extent to which I disapprove of this sort of improper prosecutorial conduct. Many years ago, the Supreme Court in Berger v. United States, 295 U.S. 78 (1935), stated the following:
 
 
 38
 The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
 
 
 39
 Id. at 88. The Court found that the prosecutor's conduct in Berger, both his presentation of the evidence and his closing argument, were improper because they were calculated to mislead the jury and that they constituted reversible error. Id. at 84-85, 89.
 
 
 40
 Consistent with this standard, this court has found reversible error when prosecutors in closing arguments have made improper remarks that were "calculated to incite the passions and prejudices of the jurors," United States v. Solivan, 937 F.2d 1146, 1151, 1155 (6th Cir.1991), and when prosecutors have made comments that constituted improper vouching for the credibility of their witnesses, United States v. Carroll, 26 F.3d 1380, 1391 (6th Cir.1994). The prosecutor in this case committed both of these errors in his closing argument to the jury.
 
 
 41
 First, the prosecutor appealed to the passions and prejudices of the jurors when he referred to evidence that was irrelevant to any of the elements of the crime with which Hill was charged and that was obviously inflammatory:
 
 
 42
 You also heard throughout the trial how lives can be destroyed by crack cocaine. You got quite an education on that. Young lives that are full of promise, potential. For example, you remember Saleena Thorn when she testified? She was the witness that was just a few credits shy of getting her college degree in fashion merchandising. She was a bright, attractive young lady, but she got involved with crack and her life turned to hell. It all went down hill after that. Now she's serving time in a federal institution.
 
 
 43
 Carmalita Baker, another young lady: bright, attractive, had a good job as a bank teller, got introduced to crack, and again she turns to crime, embezzled money to support her habit.
 
 
 44
 Or David Herrin? You remember David Herrin, about 39 years old, goes through life without a blemish on his record, yet he comes into hard times, starts selling crack for this man. And now he's got a felony conviction, he's on probation, after having gone through most of his adult life without anything. And you also heard from people who may never, ever be able to escape the impoverished, poor environment from which they come, where drugs are so prevalent.
 
 
 45
 J.A. at 347. The question of the effect of crack cocaine on the lives of the participants in this trial was irrelevant to the question of Carl Hill's participation in a conspiracy to distribute crack cocaine. These comments were injected into the closing argument solely for the purpose of inflaming the passions of the jury and encouraging prejudice against Carl Hill.
 
 
 46
 Later in the closing argument, the prosecutor made the following statements:
 
 
 47
 Michelle Sims stated that she was paid rent, paid bills, paid groceries for the use of her house. And that's corroborated by Sonny George who said that he and Zulu paid her rent, paid her bills. And look at the people that they pick on. They pick on people, they go to these people that are destitute, that are in dire need of money, that are vulnerable, these women that are on welfare, that need the money desperately. They are very smart people, the defendant and the others.
 
 
 48
 J.A. at 351. The financial status of the participants in the drug ring, however, was not relevant to Hill's guilt or innocence. Again, this statement appears to be a calculated effort on the part of the prosecutor solely to appeal to the passions, biases, and sympathies of the jury so as to convict Hill, regardless of the evidence's lack of relevance to the elements of the crime with which Hill was charged.
 
 
 49
 Finally, the prosecutor made a statement during closing argument that bordered, if not constituted, improper vouching for the credibility of his witnesses. See Carroll, 26 F.3d at 1387-89; United States v. Krebs, 788 F.2d 1166, 1176-77 (6th Cir.), cert. denied, 479 U.S. 930 (1986). Improper vouching occurs when the prestige and authority of the government are placed behind the witnesses to support their credibility. The prosecutor in this case stated the following in rebuttal:
 
 
 50
 And Mr. Brown talks about how this is all orchestrated. This is a conspiracy against Carl Hill. Well, first of all, use your common sense. Do you think that some of the witnesses here could make up this evidence against Carl Hill? Do you think they are smart enough to concoct this story and remember this story from the way they gave it back when they first gave the statement? Do you think they are smart enough to do that? To remember that?
 
 
 51
 I submit some of them weren't. They got up here and told you what happened to the best of their recollection.
 
 
 52
 J.A. at 363. Unlike the previously-quoted statements, defense counsel objected to the latter statement and argued for a mistrial on the grounds that the statement constituted improper vouching for the credibility of the government's witnesses. J.A. at 363-64. The court, however, did not find that the prosecution was vouching for the credibility of its witnesses, and the court, accordingly, denied the motion for a mistrial. J.A. at 364-65.
 
 
 53
 To the contrary, I am convinced that the government was improperly vouching for the credibility of its witnesses, and if the evidence in this case had not been overwhelming, then this improper statement, in conjunction with the others noted earlier, may have dictated a different result. Even though the government prosecutor's conduct in this case did not constitute reversible error, I hope that the tenor of my statements will force the prosecutor to question seriously the wisdom of using such rhetoric, when to do so obviously risks a mistrial and possibly provides a clearly guilty defendant with grounds for reversal on appeal. See United States v. Reliford, No. 94-5791, --- F.3d ----, 1995 WL 376671, at * 4 (6th Cir. June 27, 1995).
 
 
 
 [1]
 This sentencing guideline simply reflects the same 100:1 sentencing differential for crack cocaine versus cocaine powder that Congress previously incorporated in the federal criminal code when it enacted mandatory sentencing provisions for drug violations. See 21 U.S.C. Secs. 841(b)(1)(A), 841(b)(1)(B) (1988)
 
 
 [1]
 Some scholars and critics, however, have disputed the premise that crack is more potent than powdered cocaine. Charles Shuster, M.D., who served as Director of the National Institute on Drug Abuse for the Reagan Administration, concluded that "cocaine is cocaine, whether you take it in intranasally, intravenously, or smoked." Crack Cocaine: Hearing Before the U.S. Sentencing Com'n 112 (Nov. 9 1993), quoted in Statement of Wade Henderson, The Disparity in Sentencing Between Crack and Powder Cocaine: Hearings Before the Subcomm. on Crime of the House Comm. on the Judiciary 18 n. 26 (June 29, 1995). Moreover, Dr. George Schwartz, a noted expert in pharmacology and toxicology, has concluded that smoking cocaine is no more or less addictive than other forms of ingestion. Id. at 19
 
 
 [2]
 In addition to the effective date of the amended guidelines, a further barrier exists to the application of the amended guidelines to Hill. As noted earlier, the federal criminal code also contains the same 100:1 sentencing disparity between offenses involving crack cocaine and those involving powder cocaine. 21 U.S.C. Secs. 841(b)(1)(A), 841(b)(1)(B) (1988). The code prescribes certain mandatory minimum sentences based on the quantity of the drug and its form. See id. Mandatory sentences are delineated for offenses involving crack cocaine starting at quantities of five grams or more. 21 U.S.C. Sec. 841(b)(1)(B)(iii). Mandatory sentences are not prescribed for crack cocaine offenses involving quantities less than five grams. Although the amended sentencing guidelines, once effective, will address cocaine violations involving all quantities, they will actually only apply to crack cocaine offenses involving quantities less than five grams until Congress acts to repeal the mandatory sentencing provisions in 21 U.S.C. Sec. 841(b), which are based on the 100:1 sentencing differential. Thus, even if the amended sentencing guidelines were effective for Hill's sentencing, they still would not apply to him because he was convicted of a crack offense involving over fifty grams of crack cocaine, and he would be subject to the mandatory sentencing provisions in 21 U.S.C. Sec. 841(b)
 On March 16, 1995, Rep. Rangel introduced House Bill 1264, entitled the "Crack-Cocaine Equitable Sentencing Act of 1995," which would amend the appropriate sections of the United States Code to eliminate the 100:1 sentencing differential between crack cocaine and powder cocaine. H.R. 1264, 104th Cong., 1st Sess. (1995). The Bill has been referred to the Judiciary Committee and the Commerce Committee, but the prospects of its passage appear bleak. See H.R. 1264, available in WESTLAW, Billcast Database; BNA Daily Report for Executives, March 20, 1995.