**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Harry THOMAS (79–5271) and Anthony L. Romano (79–5175), Defendants-Appellants.**

**Nos. 79–5175/5271.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 11, 1982.

Decided Feb. 23, 1984.

Rehearing Denied April 19, 1984.

---

D. Shannon Smith, argued, Cincinnati, Ohio, for Romano.

Robert C. Green, U.S. Atty., Grand Rapids, Mich., Joel M. Gershowitz, argued, U.S. Dept. of Justice, Washington, D.C., for U.S.A.

Michael Y. Sandborn, argued, Sandborn & Theophelis, Harry Thomas, Lansing, Mich., for Thomas.

Before MERRITT and JONES, Circuit Judges, and WEICK, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Appellant Harry Thomas was convicted after a jury trial of one count of transporting fraudulently obtained money in interstate commerce in violation of 18 U.S.C. §§ 2314 and 2 ("Count 9") and one count of conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 371 and 1014 ("Count 10"). In the same trial, appellant Anthony Romano was also convicted of conspiracy to commit bank fraud ("Count 10"). On appeal from these convictions appellants assign as error the following points: (1) the district court erred in permitting their re-trial after a mistrial had been granted upon their motion because of an improper reference to a prior conviction in violation of the double jeopardy clause; (2) the district court erred in not severing the trial; (3) the district court erred in allowing the misconduct of the United States Attorney prosecuting their case to deprive them of a fair trial; and (4) the district court erroneously instructed the jury on the issue of intent. Appellant Thomas further asserts that the evidence was insufficient to support his conviction for transporting fraudulently obtained money in interstate commerce. For reasons which follow, we reject the assignments of error asserted and affirm the convictions of both appellants.

In April 1969, one Bartoli and his brother-in-law, Ronald Henry, purchased the Green Meadows Golf Course in Lansing, Michigan. Subsequently, in 1973, these same individuals began construction on a 36-lane bowling alley located on the golf course. After substantial work had been completed on the structure, the financing for this project fell through. To make matters worse, in July of that year, vandals destroyed 13 of 18 greens on the golf course, ending the use of the facility for the golfing season.

Fearful of losing his investment, Bartoli began to seek other sources of financing. Eventually, Bartoli entered into an agreement with defendant Thomas to provide funding for the troubled venture. The exact nature of this agreement is in dispute. The government asserts that Bartoli arranged for Thomas to assume his brother-in-law's fifty percent interest in the business in return for either a full or partial payment of $30,000. Thomas on the other hand, asserts that the $30,000 advance was a loan, establishing him as a creditor. A new corporation was formed and entitled Green Meadows Links and Lanes with Bartoli as its president and Thomas as its treasurer. These individuals subsequently engaged in a pattern of conduct giving rise to their criminal liability.

Shortly after Thomas' entry into the business, the firm began to obtain interim loans. For example, an application to the

Metropolitan Savings and Loan Association was submitted for a $2 million loan purportedly to complete construction of the bowling alley and to pay off the firm's existing debts. The bank issued a commitment of $1.6 million, but there was some delay in the closing of the loan. In need of funds, Thomas and Bartoli obtained a renewal of a $75,000 personal loan to Bartoli from the Bank of Commerce of Lansing, Michigan. In addition, on June 3, 1974, they obtained a $105,000 loan, on behalf of the corporation, from the Bank of Lansing. In connection with the renewal of the $75,000 loan, Bartoli submitted a financial statement of Thomas which recited that he (Thomas) owned a sizeable amount of assets (land and stocks). In reality, Thomas had, by the date of the financial statement, divested himself of these assets. In support of the $105,000 loan, Bartoli submitted Thomas' personal guarantee, a power of attorney from Thomas to Bartoli, two assignments of Evans Industries notes owned by the defendant Thomas, and a hypothecation agreement pledging the Evans notes as collateral. Although each of these documents was allegedly signed by Thomas, it was later discovered that they were, in fact, signed by Edward Magnotta, an employee of the Green Meadows corporation.

In the fall of 1974, Bartoli went to Florida to obtain Thomas' signature on the documents that supported the $1.6 million loan from Metropolitan Savings, including an assignment to the bank of 15,000 shares of Chrysler stock owned by Thomas. This assignment also called for the signature of Howard Victor, a representative of the Bache & Co., which possessed considerable equity in the Chrysler stock. Thomas signed both his own name and that of Victor, albeit without authority. Subsequently, Metropolitan Savings notified Bartoli that it was freezing the proceeds of the loan because of irregularities in the construction plan. Upset, Thomas informed Bartoli that he was sending defendant Romano to take over the general management of the project.

Soon thereafter, in what later proved to be his last official act, Bartoli obtained, on behalf of the corporation, a $70,000 loan and, once again submitted the forged unlimited personal guarantee of Thomas. This same document was submitted in support of a $40,000 corporate loan from the Bank of Lansing. Subsequently, and in reaction to so-called threats, Bartoli was "forced" to leave his office and to "give" Romano ten percent of his stock.

In October 1974, Thomas was required to meet frequent and very large margin calls in order to preserve his interest in Ryder System stock which he had substituted for the Chrysler stock pledged as collateral for the $1.6 million loan. Subsequently, in order to obtain a $50,000 corporate loan, Bartoli and Romano offered the Bank of Lansing Thomas' equity in the Ryder stock (previously pledged) as collateral. The bank accepted this offer. After Bartoli signed Thomas' name on a number of documents including a hypothecation, the proceeds were issued. Thereafter, Romano drew a check on the account of the corporation in the amount of $15,000 which was made payable to Bartoli, who subsequently drew on these funds to pay the margin account for Thomas, although the defendants had represented that the proceeds were to be used by the corporation *solely* for working capital. It was these transactions which gave rise to the appellant's criminal prosecution.

On March 16, 1978, a grand jury returned a ten-count indictment against Bartoli, Magnotta, Thomas and Romano alleging that these defendants had conspired to commit numerous acts of bank fraud, had committed the substantive offense of bank fraud, and had transported fraudulently-obtained money in interstate commerce. Prior to trial, co-defendants Bartoli and Magnotta entered pleas of guilty and were subsequently granted immunity in exchange for their testimony. Defendants Thomas and Romano were then tried jointly though Romano's trial had been severed prior to the guilty pleas.

Jury trial began on December 11, 1978, for appellant and then codefendant Harry

Thomas, in Grand Rapids, Michigan. During the direct examination of former codefendant Edward B. Bartoli, on December 13, 1978, reference was made to a prior conviction of appellant Thomas. Appellant Thomas' trial counsel immediately objected and moved for a mistrial which was granted on December 13, 1978. The conviction that was mentioned was 14 years old, and the defense counsel had filed a motion *in limine,* which had not been ruled upon. Rather, the court had instructed the government to give notice before any evidence of prior crimes would be introduced, so that the court could rule on the motion. The reference made to this conviction was not invited by question, and appears to have been unsolicited.

A second trial began on January 23, 1978, and ended February 21, 1978, with the convictions challenged on these appeals. Appellant Thomas was sentenced to concurrent terms of seven years and five years on his two-count conviction, and fined $10,000. He is presently free on bail of $100,000 pending appeal. Appellant Romano was sentenced to 18 months imprisonment and fined $1,000. He is free on his own recognizance pending appeal.

## I. DOUBLE JEOPARDY

Several months prior to defendants' first trial, Thomas moved the district court for an order directing the United States Attorney and all prosecution witnesses to refrain from alluding to Thomas' 14 year-old convictions for tax evasion pursuant to Rule 609 of the Federal Rules of Evidence. The

district court held this motion in abeyance and reasoned:

> In this case, the parties have failed to advise the Court, by affidavit or otherwise, of relevant considerations under Rule 609(b). While defendant's motion alludes to a plea entered "almost fourteen (14) years" ago, the Court has been provided with no information on the date or circumstances of the plea or the sentence imposed. Since the ten year period prescribed in Rule 609(b) is calculated from the date of release, this information is essential to a proper consideration of the motion. Defendant has the burden of providing the court with this information. *United States v. Brown,* 476 F.2d 933 (D.C.Cir.1973).

> Moreover, assuming that the 10 year period has elapsed, the Government has neither presented the Court with "specific facts and circumstances" demonstrating that the probative value of such evidence "substantially outweighs" its prejudicial effect, nor, as far as the Court can determine, has it served defendant with a written notice of its intent to use such evidence.

> In the absence of the information prescribed by Rule 609 and outlined above, a determination of this motion at this time would be premature. Accordingly, defendant Thomas' motion in limine is held in abeyance.

However, at the first trial, the government's chief witness, Bartoli, referred to these prior convictions in response to the prosecutor's question whether Thomas had resigned his office as treasurer of the firm.[1]

---

1. The disputed testimony arose as follows:

Q. In regards to sitting on a corporation, there is a board of directors?
A. Right.
Q. Was Mr. Thomas desirous of assuming a position on that board, or as part of—
A. Well, he wanted to assume the position of treasurer of the company, and he did sit as treasurer of the company for a short time.
Q. What is the function of treasurer of the company?
A. He handles the money; writes the checks.
Q. And did he have any other requests regarding the representation of the company?

A. Well, he had a request that the 50 percent ownership—I sent down through Mr. Roach half of the stock ownership, and he had a request that we change that to an option to purchase 50 percent of the stock rather than owning the actual stock.
Q. Who was the attorney for the corporation at this point?
A. Leo Farhat from Lansing, Michigan.
Q. And when Mr. Thomas came into the picture, who was going to be the attorney?
A. Well, he requested that we drop the Farhat firm, and that the McClintock firm in Detroit would be the attorneys for the company.

On the motion of both appellants, the trial court granted a mistrial. The appellants now assert that the prosecutor, by his failure to instruct his chief immunized witness to refrain from any mention of Thomas' previous conviction and/or the trial judge's failure to rule on the motion *in limine* forced him to request a mistrial and impermissibly placed him in jeopardy a second time. Specifically, the appellants point to the affidavit of defendant Romano's trial counsel which indicates that the government prosecutor rehearsed and coached Bartoli for a significant amount of time and intimates that his convenient "slip of the tongue" was part and parcel of the government's plan. Appellants also intimate that Bartoli knew better because he was a lawyer. They indicate that these facts lead one to the conclusion that Bartoli must have been instructed to offer this testimony. We find the appellants' argument unconvincing.

Ordinarily, a defendant's motion for mistrial removes any barrier to a retrial. *United States v. Love,* 597 F.2d 81 (6th Cir.1979). However, an exception to that rule has developed where the call for mistrial is precipitated by "prosecutorial overreaching." *United States v. Enoch,* 650 F.2d 115 (6th Cir.1981). The Supreme Court, in *Oregon v. Kennedy,* 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982), has stated that "a defendant may invoke the bar of double jeopardy in a second effort to try him [where] . . . the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." That opinion, and opinions from this Circuit, make clear that prosecutorial behavior will bar a second trial only where such behavior was "intentionally" calculated to cause or invite mistrial. *See Robinson v. Wade,* 686 F.2d 298 (5th Cir.1982); *United States v. Robuck,* 690 F.2d 794 (10th Cir. 1982).

Our review of the record leads us to conclude that none of the prosecutor's behavior here will pass the intentional-goading-into-mistrial test of *Oregon.* The failure to notify the witness, in this context, is at most negligence. The line of questioning was not such that the prosecutor could be said to have been inviting the answer. Nor is there any evidence to suggest that the prosecutor encouraged the witness or intentionally failed to notify him *knowing* that he would mention the conviction.

Moreover, the appellant's suggestion that the prosecutor orchestrated the whole thing seems unclear at best. The affidavit[2] in support of this proposition merely states that the government spent nearly 15 hours preparing the witness, and that the witness,

---

Q. Originally Mr. Thomas was to have a stock ownership, 50 percent?
A. Right.
Q. And a subsequent date, he relinquished the stock ownership?
A. Right.
Q. And he gave up his seat as treasurer?
A. Right. He informed me that he had a prior conviction for income tax, and because in Michigan if you sit on—if you're a stockholder in a company, and you have a prior income tax or any conviction for that matter, you cannot get a liquor license in Michigan; that, because we were going to apply for a new liquor license.

It is obvious that the witness' response was both unresponsive to the particular question and appears to be the product of Mr. Bartoli's own volition.

2. In pertinent part, the affidavit reads;
I have spoken this date, January 18, 1978, by telephone with Mr. Kraus, counsel for Bartoli, and he advised me that he estimated that he had spent at least 15 hours in the presence of Mr. Bartoli and Mr. Ewald concerning Mr. Bartoli's information and potential testimony in the trial prior to the declaration of the mistrial. Mr. Kraus also advised me in this conversation that Mr. Ewald had discussed with Mr. Bartoli several times, prior to the trial, the fact of and circumstances surrounding Mr. Thomas' prior conviction and transfer of the stock to Mr. Thomas' attorney—in short, the testimony of Mr. Bartoli at the trial which caused the mistrial. Mr. Kraus also advised me at that time that during the discussions of Mr. Ewald with Mr. Bartoli, in Kraus' presence the night before the mistrial, that same information was covered in a summary fashion and that, in fact, in one of the previous conversations, Mr. Bartoli had asked Mr. Ewald if the Judge had yet ruled on the motion in limine concerning Mr. Thomas' prior conviction being admissible or not, and was advised by Mr. Ewald that the Court had not yet ruled.

Mr. Bartoli, had been informed both of the prior conviction and the fact that there was a motion *in limine* which had not yet been ruled upon. There is nothing to suggest that this was part of an intentional plan to goad the defense into mistrial.

■ Second, the claim made by defendants that the failure of the trial judge to rule on the motion *in limine* is also insufficient to bar the second trial. The court has wide discretion in these matters, *United States v. Crisona*, 416 F.2d 107 (2d Cir.1969). Here, the court did not rule on the motion, but did order that the prosecution give notice that it would introduce the evidence of prior crimes so that it could rule on it before such an admission. We do not believe that this constituted an abuse of the court's discretion. Accordingly, we hold that the retrial of the appellants did not offend the double jeopardy clause under the circumstances of this case.

## II. SEVERANCE

Appellant Romano contends that he was prejudiced by the failure to sever his trial from that of Thomas. He argues that here the evidence is so overwhelming against Thomas that he was prejudiced because of the disparity of evidence. In addition, he claims that he was prejudiced because he had to object at trial to make clear that the witnesses were testifying only as to Thomas's activities, and those objections put in the mind of the jury the idea that he had something to hide.

■ The district court's rulings on the motions of severance are reviewed for abuse of discretion. *United States v. Frazier*, 584 F.2d 790 (6th Cir.1978). Moreover, the jury must be presumed capable of sorting out the evidence and considering the case of each defendant separately. *Id.* Finally, a great disparity of evidence against the two defendants alone normally will not require separate trials, *United States v. Hoffa*, 349 F.2d 20 (6th Cir.1965), but it may be a reason to find abuse of discretion. *United States v. Gaines*, 563 F.2d 1352 (9th Cir.1977). The test is whether "the jury can reasonably be expected to compartmen-

talize the evidence as it relates to separate defendants in light of its volume and the limited admissibility." *United States v. Gaines, supra* at 1355.

■ We hold that the district court did not abuse its discretion in trying the appellants jointly. The evidence is such that although lengthy, the trial was pretty straightforward. There were not numerous instances where some prejudicial piece of evidence was admissible as to one defendant and not the other. Moreover, Romano's involvement was in one part of an overall scheme. The evidence as to him was thus limited and focused. Finally, the defendant has not shown specific cases of prejudice, but rather seems to have thrown this issue in with his broad attack on his conviction.

## III. PROSECUTORIAL MISCONDUCT

Appellants argue that certain acts of misconduct by the U.S. Attorney, taken in their totality, deprived him of a fair trial. Specifically, the appellants point to the following six acts:

1. Appellants object to the procedure whereby Bartoli was escorted to the witness stand by federal marshals in the presence of the jury.

2. Appellants object to the prosecution's waving a piece of paper that was neither in evidence nor shown to the court or counsel while questioning appellant Thomas about his whereabouts on November 22, 1974, when one of the loans was obtained. Appellants suggest that this was an improper attempt, upon the prosecutor's part, to intimate that he had proof that Thomas was in Lansing.

3. Appellants object to the prosecutor's inquiry of Thomas during cross examination whether he had threatened his lawyer, who was not available to testify.

4. Appellants take issue with the prosecutor's remark in its summation that Thomas had been "looking those witnesses right in the eye for four weeks.

It's a nice old trick, trying to stare them down, trying to threaten them."

5. Appellants object to the portion of the prosecutor's summation in which he quoted Thomas' threat against Bartoli that: "We know where you are, We know where your wife and child is, We can find you anywhere." Appellants argue that the quotation implied that Thomas had underworld connections.

6. Appellants object to the prosecutor's reference in his summation to Frank Fitzsimmons, then President of the Teamsters Union, as Thomas's "friend".

 As this Court made clear in *United States v. Bess,* 593 F.2d 749 (6th Cir. 1979), an attorney's task is to persuade the jury based solely on the proof at trial and the reasonable inferences drawn from that evidence. The court there reiterated the Supreme Court's warning with respect to prosecutor's actions at trial:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is

to use every legitimate means to bring about a just one.

*Id.* at 754 *quoting Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). To warrant a new trial, however, prosecutorial misconduct "must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.), *cert. denied sub nom., Bella v. United States,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980), quoting *United States v. Blevins,* 555 F.2d 1236, 1240 (5th Cir.1977), *cert. denied,* 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978). Furthermore, the prejudicial effect of improper comment or questioning may be negated by curative instructions to the jury. *Lichenstein, supra* at 1281–82. In light of the relatively strong evidence of guilt, and the trial court's curative instructions to the jury, we reject the contention that the prosecutor's misconduct in this case necessitated a new trial.

## IV. JURY INSTRUCTIONS

 Appellants argue, relying upon *United States v. Reeves,* 594 F.2d 536 (6th Cir.1979), that the court's instruction to the jury on intent[3] improperly shifted to them the burden of proof to them on this crucial issue. This argument is without merit. In *Reeves,* we reviewed a slightly different instruction. In that case, the trial court had instructed that there was a *presumption* that the defendant intended the natural and probable consequences of his actions and that the presumption would stand absent a contrary showing. That instruction, this Court held, impermissibly shifted the burden of showing intent. Yet, this Court, in *Reeves,* approved of an instruction on this issue which only allows an *inference* of intent found in 1 Devitt & Blackmar, *Fed-*

---

**3.** The judge instructed the jury, in part, as follows:

Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind. You may consider it reasonable to draw the inference and find that the person intends the natural and probable consequences of acts knowingly done, or knowingly omitted.

As I have said, it's entirely up to you to decide what facts you find from the evidence.

*eral Jury Practice and Instructions,* (3d ed. 1977). *Id.* at 541. The charge here is precisely the charge approved in *Reeves.* Furthermore, this Court has affirmed that position in *United States v. Bohlmann,* 625 F.2d 751 (6th Cir.1980). The charge, then, was not error.

## V. SUFFICIENCY OF THE EVIDENCE

Appellant Thomas claims that the evidence against him was insufficient to support his conviction on Count 9. This count charged that Bartoli, Romano and Thomas devised a scheme to obtain money by false pretenses from the Bank of Lansing in connection with the loan of November 1974. The indictment alleged that Thomas and Bartoli represented that the proceeds of the loan would go to interim construction costs, but that they were used to pay off the Bache margin account instead. In addition, the count charged that Romano and Thomas conspired [with Bartoli] to transport the stolen money in interstate transportation. Specifically, the indictment referred to the $15,000 check which was put in the Bache account.

Appellant Thomas argues that the loan papers said that the loan was for working capital, and that this term includes paying creditors to keep the business going. Thomas alleges that he was a creditor of the corporation and thus properly received the money. Second, he argues that he did not sign the note obligating himself to the bank. Thus, he contends he cannot be found guilty on Count 9.

The government argues that the payment to Thomas was not as a creditor, but rather the $30,000 "loan" Thomas allegedly gave the corporation was the initial "payment" for his 50 percent interest. Thus, they contend, the payment to Thomas was not a payment on a loan and thus not a payment to a creditor. Though Thomas eventually did change his status from that of stockholder to creditor, that change did not take place until after the payment of the $15,000 in question. There is ample corroboration in the record for the government's position. Though there is some evidence that conflicts with this view, there is sufficient evidence upon which a jury could find against Thomas.

The government also introduced further testimony which corroborated that of Bartoli. For example, a certified public accountant who was retained by the corporation in 1974 to reconstruct and audit its books for that year, testified that appellant Romano told him that the $30,000 payment from Thomas was for the purchase of stock in the corporation and not a loan. In addition, the accountant testified that he could not find any indication in the corporate records that the $30,000 payment was a loan or that any interest was paid on it. It should be noted, in contrast, that when Thomas did lend the corporation $12,000 in February 1974, the payment was denoted as a loan in the corporate records and interest was paid. The accountant concluded, for the purposes of his audit, that Thomas was a stockholder of the corporation rather than a creditor, and this conclusion was supported by the testimony of two IRS agents who audited the books of the corporation and who testified at trial. Since the $15,000 payment to Thomas cannot be characterized as the repayment of a loan, there was sufficient evidence at trial to demonstrate that this payment was inconsistent with the defendant's representations to the bank concerning his purpose in seeking the loan. Accordingly, we conclude that this prong of the appellant's argument is without merit.

A similar conclusion is mandated concerning the second prong of the appellant's argument. The essential elements of the offense under 18 U.S.C. § 2314 are: (1) the devising of a scheme or artifice to defraud or obtain money by false pretenses or representations and (2) causing or inducing an intended victim to travel in interstate commerce with the intention to defraud that person of money or property having a value of $5,000 or more. *United States v. Edwards,* 516 F.2d 913 (8th Cir. 1975). The evidence at trial also was sufficient to establish that Thomas knew about the $50,000 loan from the Bank of Lansing

and that he intended to defraud the bank. This evidence satisfies the first element outlined above. Once again, his former co-defendant Bartoli provided the bulk of this evidence. For example, Bartoli testified that he kept Thomas abreast of the negotiations for this particular loan. Moreover, he testified that when in the course of negotiations the bank indicated that it would no longer extend credit to the corporation on an unsecured basis, Bartoli telephoned Thomas to see if they could use his Ryder System stock as collateral. Not only did Thomas consent to the use of his stock, but he also subsequently discussed the matter directly with the representative of the bank. In addition, Bartoli testified that after the loan was approved, he telephoned Thomas again to tell him that he was sending the codefendant Magnotta to Florida to obtain Thomas' signature on the loan documents.

Bartoli's testimony also indicated that Thomas did, indeed, have the intent to defraud the bank for it showed that at the time the loan was obtained, Thomas knew that a portion of the proceeds would be applied to his margin debt at Bache & Co. Specifically, Bartoli testified that on November 22, before the loan was closed, Thomas telephoned Romano and directed him to deliver $15,000 of the loan proceeds to Bache. Finally, as detailed in the facts, there is little doubt that the defendants in this case transported the proceeds of this loan through interstate commerce.

Appellants have also alleged other errors which we deem insufficient to warrant reversal of the convictions in this case. Accordingly, for the reasons specified above, the judgments of conviction are AFFIRMED.