811 F.2d 608
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Donald TURNPAUGH, Petitioner-Appellant,
v.
Dale FOLTZ, Respondent-Appellee.
 No. 85-1563.
 United States Court of Appeals, Sixth Circuit.
 Dec. 2, 1986.
 
 Before ENGEL, JONES and KRUPANSKY, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from the denial of a petition for a writ of habeas corpus. The petitioner, Donald Turnpaugh, was convicted of two counts of first-degree murder on July 1, 1977, and sentenced to life imprisonment without parole. On July 15, 1982, with one dissent, the Michigan Court of Appeals affirmed the conviction. On June 28, 1983, the Michigan Supreme Court denied leave to appeal. People v. Turnpaugh, 417 Mich. 1023 (1983). Petitioner then filed two identical petitions for habeas corpus in the district court for the Eastern District of Michigan. The petitions were consolidated, and on November 30, 1984, the district court dismissed the case for failure to exhaust available state remedies as required by 28 U.S.C. Sec. 2254(b) and (c) (1982). On January 17, 1985, pursuant to Rose v. Lundy, 455 U.S. 509, 510 (1982), the district court granted petitioner's motion to file an amended petition. Petitioner subsequently filed an amended petition and presented four claims for habeas review. On May 22, 1985, the district court entered its judgment denying the petition. This appeal followed. We affirm the district court's denial of the petition.
 
 I.
 
 2
 The petitioner's convictions arose out of the murders of Homer Bush and Jackie Adamson on April 9, 1977. The murders took place between 11:45 a.m. and 12:40 p.m. on the Saturday before Easter Sunday at the Flint Realty in Flint, Michigan, where Bush and Adamson were employed. Bush was shot twice in the back of the head. He was also struck on the head twice with a hammer before his death. Adamson was struck on the head once with a hammer and shot once in the back of the head. Both victims were apparently forced to lie face down on the floor before being murdered. Petitioner was arrested and charged with the murders.
 
 
 3
 The major witnesses against petitioner at his trial were Theresa Bush, Homer Bush's wife, and Ralph M. Henry, who was employed by petitioner. Mrs. Bush, testifying under a grant of immunity, testified as follows. She first met petitioner when he offered to sell her a house in June 1976. Within a week of their first meeting, the two of them became involved in an intimate relationship. At one point, petitioner told Mrs. Bush that he wanted to "get rid" of Homer Bush. Petitioner also sought information about Mr. Bush from Mrs. Bush, such as whether he owned a gun. Over a number of months, petitioner followed Homer Bush and Bush's secretary and went to Flint Realty a number of times. About four weeks prior to the murders, the relationship between Mrs. Bush and petitioner began to change. At that time, the two of them began to go out about every night. Mrs. Bush then told petitioner that she did not want to see him anymore. About a week before this, petitioner had been talking to Mrs. Bush about some highly publicized murders and told her that if a person wanted to get away with a crime, he merely had to do it during the daytime. Petitioner also told Mrs. Bush to leave her husband. Mrs. Bush met petitioner at about 2:45 p.m. on the day of the murders. She didn't learn of the murders until after she and petitioner had parted company in the early evening. After learning of the murders, Mrs. Bush visited petitioner at his apartment and told him of the murders. According to Mrs. Bush, petitioner did not change his expression.[1]
 
 
 4
 Ralph Henry testified as follows. He and petitioner once "shot up" a house owned by Bush. About four to six weeks before the murders, petitioner told Henry that it was easy to kill a person and it would be easier to beat a murder charge than a speeding ticket. The Saturday before the murders, April 2, petitioner told Henry that he had something going and that there was going to be a change in their normal Saturday routine. Petitioner told Henry that his car would be parked in front of his business on April 9, but he wouldn't be there. Petitioner also told Henry to tell anyone who might ask that the two of them had been together since ten o'clock in the morning on April 9. Henry also testified that he had given petitioner a Smith & Wesson .38 caliber five shot, snub-nosed revolver that had its serial number filed off. After Henry gave this gun to him, petitioner purchased a gun exactly like the one Henry had given him and gave it to Henry. He later told Henry not to tell anyone about the switch. The gun that Henry gave petitioner was loaded with three 158 grain Remington-Peters round nosed shells.
 
 
 5
 Sergeant Don Hatchew of the Flint Police Department testified that he executed a search warrant of the petitioner's home and seized a box marked "Remington one hundred and twenty-five grain." The box contained nineteen hollow-point cartridges and three round lead cartridges. Sergeant Kenneth Maciejewski, a state police firearms expert, testified that the bullets removed from the heads of Bush and Adamson were characteristic of .38 caliber Remington-Peters one hundred and twenty-five grain semi-jacketed hollow point bullets. He also testified that all three bullets were fired from the same revolver. Rifling on the bullets showed rifling characteristics of a Smith & Wesson gun, which indicated that the bullets had been fired from such a gun. The murder weapon was never found.
 
 II.
 
 6
 At the close of trial, the trial court gave the following jury instruction:
 
 
 7
 I want to talk to you now about the inference of malice that I mentioned. If you find that the Defendant consciously intended to commit, attempt or assist another in the crime of the murders under Count I and Count II, you may infer that he knowingly created a very high risk of death with knowledge that it would probably cause death. In other words, the use of the hammer and gun.
 
 
 8
 App. at 206. Petitioner claims that this instruction unconstitutionally shifted the burden of persuasion on him with regard to the issue of intent, relieving the state of its responsibility of establishing every essential element of a crime.
 
 
 9
 In Sandstrom v. Montana, 442 U.S. 510 (1979), the Supreme Court held that a criminal defendant's due process rights are violated when he is convicted on the basis of a jury instruction that a reasonable juror may interpret as shifting the burden of proof of an element of the crime or as creating a conclusive presumption with respect to an element of the crime that must be proved by the state beyond a reasonable doubt. The defective instruction in Sandstrom provided that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." Id. at 513.
 
 
 10
 The instruction at issue here does not require the mandatory presumption found in Sandstrom. However, it does allow the jury to infer intent. In the recent case of Francis v. Franklin, 105 S.Ct. 1965 (1985), the Supreme Court held that under certain circumstances inferences do not violate due process. The Court noted that:
 
 
 11
 "The threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes." The court must determine whether the challenged portion of the instruction creates a mandatory presumption, or merely a permissive inference. A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves certain predicate facts, but does not require the jury to draw that conclusion.
 
 
 12
 Mandatory presumptions ... violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of an offense. A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proven. Such inferences do not necessarily implicate the concerns of Sandstrom. A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.
 
 
 13
 Id. at 1971 (citations and footnotes omitted). Similarly, in United States v. Thomas, 728 F.2d 313 (6th Cir.1984), this court held that a jury instruction that only allows an inference of intent is constitutionally sound. The instruction at issue there instructed the jury that it could "infer the defendant's intent from the surrounding circumstances." Id. at 320 n. 3. See also United States v. Johnson, 756 F.2d 453, 454-55 (6th Cir.1985) (noting that there is a distinction between instructing on a presumption and on an inference).
 
 
 14
 The instruction at issue here provides that the jury "may infer" intent. This is a permissive inference. Thus, like the instruction in Thomas, the instant instruction allows an inference of intent but does not demand it. The inference included in the instruction does not violate due process because the suggested conclusion is "one that reason and common sense justify in light of the proven facts before the jury." Francis 105 S.Ct. at 1971. The brutal and calculated nature of the murders readily leads to the conclusion that the perpetrator did indeed intend to murder the victims. Therefore, petitioner's claim that the jury instruction violated his due process rights is meritless.
 
 III.
 
 15
 Petitioner also argues that the prosecution used perjured testimony during the trial and thus denied him his constitutional right to a fair trial. The Supreme Court has unequivocally stated that "a conviction obtained through the use of false evidence, known to be such by the representatives of the State, must fall under the Fourteenth Amendment." Napue v. Illinois, 360 U.S. 264, 269 (1959). See also Giglio v. United States, 405 U.S. 153, 152 (1972) ("deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' " (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)).
 
 
 16
 Petitioner cites the following passage involving the testimony of Mrs. Bush in support of his claim:
 
 
 17
 Q: Did you testify at that preliminary examination? In this murder case where Mr. Turnpaugh is the defendant?
 
 
 18
 A: Yes.
 
 
 19
 Q: Was that testimony given before you had the understanding that your testimony was in any way tied to not having to face any murder charges in the future?
 
 
 20
 A: Yes.
 
 
 21
 App. at 152-53. Petitioner claims that Mrs. Bush had entered into an agreement with the prosecutor granting her immunity prior to testifying, and therefore, her claims to the contrary were false. The record is clear that Mrs. Bush had in fact entered into such an agreement prior to testifying.
 
 
 22
 The district court considered petitioner's claim and concluded that Mrs. Bush's testimony was not false because:
 
 
 23
 [s]he did not deny that the plea bargain had been arrived at before the preliminary examination. Instead, she testified that she did not know that the dismissal of the murder charges against her was a part of the bargain. She had simply assumed that these charges had simply been dismissed for lack of evidence and that the dismissal had nothing to do with the plea bargain.
 
 
 24
 App. at 214. The district court's conclusion that Mrs. Bush's testimony was not perjured is correct. Mrs. Bush was asked about her "understanding" as to why the murder charges against her were dropped. Her reply reflected her understanding of the situation, i.e., that the charges were dropped because of a lack of evidence. Although the passage cited by petitioner is somewhat ambiguous, when taken in the context of Mrs. Bush's entire testimony, it is not false. This conclusion is supported by the fact that later in her testimony Mrs. Bush stated that: "the murder charge ... that it had been dropped for lack of evidence.... That's the way I understood it." App. at 158-59. Therefore, since the testimony petitioner cites to is not perjured, his claim that perjured testimony was used against him is meritless.
 
 IV.
 
 25
 Petitioner next argues that the prosecution failed to present sufficient evidence to sustain his conviction of premeditated murder. In Brown v. Davis, 752 F.2d 1142 (6th Cir.1985), this court noted that:
 
 
 26
 the relevant question for the federal court in the habeas corpus proceeding is not whether it believes the evidence at the state trial established guilt beyond a reasonable doubt, but whether, after viewing the totality of the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."
 
 
 27
 Id. at 1147 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The court added that "[a]s a court of review, we must draw all available inferences, and resolve all issues of credibility, in favor of the jury's verdict." Id.
 
 
 28
 Petitioner argues that no evidence was presented placing him at the scene of the crime, there was no evidence of a murder weapon, no eyewitness testimony was presented, and there was no demonstration of intent. He also argues that several other people could have committed the murders. We have reviewed the evidence presented against petitioner and conclude that there is sufficient evidence to sustain his conviction. Although it appears that there was no direct evidence linking petitioner to the crimes, there was a great deal of circumstantial evidence that indicates that he was the perpetrator. This court has held that a finding of guilt beyond a reasonable doubt may be based on circumstantial evidence. Scott v. Perini, 662 F.2d 428, 433 n. 7 (6th Cir.1981), cert. denied, 456 U.S. 909 (1982). Evidence was presented that the petitioner and the wife of one of the victims were engaged in an extramarital affair. Homer Bush's wife also testified that petitioner had at one point discussed "getting rid" of Bush. Additionally, bullets retrieved from the bodies of the victims were of the same kind, size and grain as bullets seized from petitioner's house. He was shown to have been in possession of a gun of the same type used in the murders. He was also shown to have taken steps to conceal his whereabouts and establish an alibi before the murders. Therefore, we conclude that there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that the petitioner committed the crimes with which he was charged.
 
 V.
 
 29
 Petitioner finally argues that he was denied effective assistance of counsel at his trial. Petitioner claims that his defense counsel's failure to object to a jury instruction that, in effect, required the jury to acquit him of the greater offense of first degree murder prior to consideration of lesser included offenses, establishes that he was denied effective assistance of counsel. The district court concluded that the instruction was erroneous, but nonetheless rejected petitioner's claim of denial of effective assistance of counsel.
 
 
 30
 The Supreme Court addressed the issue of ineffective counsel in Strickland v. Washington, 104 S.Ct. 2052 (1984). The Court noted that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 2064. The Court concluded that in order for a convicted defendant to have his conviction reversed he must:
 
 
 31
 First ... show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 32
 Id. The Court also stated that in order for the defendant to establish prejudice he
 
 
 33
 must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 
 
 34
 Id. at 2068. Petitioner appears to satisfy the first prong of the Strickland test--his defense counsel's performance may have been deficient in that he failed to object to an obviously erroneous instruction. In light of this, the resolution of this issue turns on whether petitioner was prejudiced by his defense counsel's performance, i.e., whether there is a reasonable probability that, but for counsel's error, the result of the proceeding would be different. The district court considered this question and concluded that:
 
 
 35
 In the present case, the only real issue at trial was the perpetrator's identity. At no time did Petitioner ever argue that any of the elements of first degree murder had not been shown. Hence, even had counsel objected and the trial court given the proper instruction, it is not reasonably probable that Petitioner would have been convicted of a lesser included offense.
 
 
 36
 App. at 216. We agree with the district court's analysis of this issue. The petitioner has not established that there is a reasonable probability that the outcome of the trial would have been different but for his counsel's error.
 
 VI.
 
 37
 For the reasons set forth in this opinion, the district court's denial of the habeas corpus petition is AFFIRMED.
 
 
 
 [1]
 Mrs. Bush was originally arrested for the murders. It eventually came to light that she and petitioner had been involved in a number of arsons and larcenies in the Flint area. As part of a plea bargain with the prosecution, Mrs. Bush agreed to plead guilty to malicious destruction of property under one hundred dollars in return for testifying against petitioner in each case against him. The murder charges against Mrs. Bush were also dismissed as part of the plea bargain