96 F.3d 1448
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Alvin MARTIN, Petitioner-Appellant,
v.
Arthur TATE, Jr., Respondent-Appellee.
 No. 95-4168.
 United States Court of Appeals, Sixth Circuit.
 Sept. 5, 1996.
 
 Before: LIVELY, BOGGS, and NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Alvin Martin appeals from the district court's denial of his petition for habeas corpus under 28 U.S.C. § 2254. We affirm.
 
 
 2
 * On October 5, 1988, Martin was indicted in Hamilton County, Ohio on three counts of felonious assault, one count of attempted murder, and one count of possessing a weapon while under a disability, primarily because Martin pistol whipped and then shot Victor Lane in the Winston Terrace suburb of Cincinnati in the early morning hours of September 17, 1988. Martin's first trial ended in a mistrial. He was found guilty on all counts on July 10, 1989, at the end of a second trial. With the assistance of counsel, he appealed, but on October 10, 1990, the Ohio Court of Appeals affirmed the judgment of the trial court. Martin then appealed to the Ohio Supreme Court, which dismissed his appeal. In October 1991, the United States Supreme Court denied Martin's petition for a writ of certiorari. On December 23, 1992, Martin filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. The magistrate judge assigned to the case filed a report and recommendation on March 21, 1995, recommending that the petition be denied, but that the certificate of probable cause necessary for taking an appeal under 28 U.S.C. § 2253 and Fed.R.App. 22(b) be issued. Upon de novo review, the district court adopted in all respects the magistrate judge's report and recommendation on October 10, 1995. Martin, now represented by counsel, filed a timely notice of appeal.
 
 
 3
 Martin raised a number of issues in his habeas petition whose disposition he is not now appealing. Obviously, he has waived his right to appellate review of these issues. In this opinion, drawing to a significant extent from the magistrate judge's report, we highlight the facts of his two Ohio trials only as they bear upon the two issues Martin is appealing.
 
 
 4
 Martin's criminal case was originally assigned to Hamilton County Court of Common Pleas Judge Kraft. While Martin was awaiting the start of his trial in Judge Kraft's courtroom, Martin alleges that the prosecutor laughed at him and tried to taunt him. Before his trial got underway, however, Martin's case was transferred to Judge Wilson, another judge in the same court. This first trial began with the prosecutor attempting to introduce a transcript of testimony by Lane, the victim, in an earlier preliminary hearing. Lane, a fugitive from sentencing in connection with his own conviction for carrying a concealed weapon, was not available to testify. A police officer testified that he was unable to locate Lane. This officer believed that Lane feared for his safety because he did not want to be placed in the same jail with Martin. The court ruled that Lane's previous testimony could not be excluded in its entirety, but reserved the right to make further rulings about the admissibility of particular portions of that transcript as the trial proceeded in order to satisfy the defense's concern that it would be unable to cross-examine Lane.
 
 
 5
 Unusual friction between the prosecution and defense permeated the first trial. On the first day of trial, the prosecutor reported to Judge Wilson that two eyewitnesses who had come to testify had departed the courtroom. On the second day of the trial, the prosecutor represented to the court that while his witnesses were now present, they were afraid to testify because the "defendant's people are out there harassing them now." In the course of arguing a defense motion at sidebar, the prosecutor stated, out of the jury's hearing, that this defense motion was "a shyster trick of a shyster lawyer." Martin argues that none of the prosecution's witnesses were available for trial, but four eyewitnesses to Martin's assault on Lane did testify on the second day of the trial. As the magistrate judge noted, Martin's insistence to the contrary stems from the testimony of a police officer early in the trial that none of the witnesses the police officer had interviewed were present when he testified. The magistrate judge correctly concluded by examining the trial transcript that the relevant witnesses testified after the police officer had made the statement Martin relies upon.
 
 
 6
 The government asked the court's permission to treat the fourth eyewitness against Martin as a hostile witness, presumably because, in the prosecutor's view, the witness was not being forthcoming with the court out of fear of Martin and "his people." In response to a defense objection, the prosecutor stated, "I'd like the record to reflect that every time this witness looks at me, she has to look at this Rogue's Gallery of the defendant's people, glaring at her, in an attempt to intimidate her from testifying." The parties refer to the peculiar "architecture" of the courtroom as being a contributing factor to the prosecution's perception that the witnesses were being intimidated; we take this to mean only that the quarters of the courtroom were cramped.
 
 
 7
 After the "Rogue's Gallery" remark, Martin's counsel moved for a mistrial. Defense counsel argued to Judge Wilson that the prosecutor had goaded the defendant into moving for a mistrial, citing the "shyster" remark and the alleged taunting episode that occurred before the trial got underway. Defense counsel asserted that deputy sheriffs and "other people" could corroborate the allegation of prosecutorial taunting. In granting the motion for a mistrial, Judge Wilson specifically found that the prosecutor did not deliberately intend to cause a mistrial by his conduct. There is no conflicting evidence in the record relating to the prosecutor's intent. Judge Wilson believed that the prosecutor's "Rogue's Gallery" remark was motivated only by the desire to have the fourth eyewitness declared hostile in light of changes in her testimony.
 
 
 8
 Victor Lane showed up for Martin's second trial, this time before Judge Kraft. In an attempt to avoid the problems he perceived that arose in the first trial related to witness intimidation, the prosecutor made a motion on the third day of the second trial for an exclusion order. The prosecutor requested that Judge Kraft clear the courtroom of spectators during the testimony of four particular witnesses and that these witnesses' names and addresses not be disclosed in open court.[1] The trial court granted this motion, but went further and ordered defense counsel not to disclose the names and addresses of these witnesses to Martin. Before trial, however, the prosecution had provided the defense with the names and addresses of these witnesses along with their criminal records and prior relevant statements. During the trial, the witnesses provided testimony that indicated they resided in the Winston Terrace area. One witness, for instance, admitted on the stand to living in the building where the shooting and beating of Lane took place. Martin's counsel attempted to argue that he could not adequately cross-examine one of the four witnesses because the questions he intended to ask might reveal the witness's identity to his client, but the trial court rejected this argument by noting that it did not intend to foreclose any such questioning of that witness. Nevertheless, Martin's counsel chose not to pursue this line of cross-examination. Generally speaking, defense counsel's cross-examination strategy seemed to focus on attempts to develop various inconsistencies between the testimony of the four witnesses, of which there were several. For instance, two of the witnesses testified that the shooting and beating of Lane occurred on different stories of the building. Martin's counsel did not make much use of potential impeachment arguments stemming either from general credibility problems with the witnesses or the personal relationships of some of the witnesses to Lane. We must conclude this was a strategic choice.
 
 
 9
 Martin's counsel, in a move that can only be tactfully described as paradoxical, argued to Judge Kraft in an attempt to defeat the prosecution's motion for this exclusion order: "[F]irst of all, the prosecution has just revealed their names in open court in front of spectators. Secondly, at least one of those witnesses has testified in open court. All of these witnesses live at the same place. They are known to everyone involved in this matter." Nevertheless, defense counsel insisted that if the court granted the motion for the exclusion order, it would be "treading closely to violating the defendant's constitutional rights to face his accusers." The defense again moved for a mistrial after losing the argument over the motion, but this motion was denied and the jury went on to find Martin guilty on all of the counts with which he was charged.
 
 II
 A. Double Jeopardy
 
 10
 We review habeas petitions under 28 U.S.C. § 2254 de novo. Daniels v. Burke, 83 F.3d 760, 763 (6th Cir.1996). Like the district court, however, we must "give complete deference to state court findings unless they are clearly erroneous." Levine v. Torvik, 986 F.2d 1506, 1512 (6th Cir.1993) (citations omitted). In this case, Martin cannot overcome an adverse finding of fact made by the state trial court because there is no evidence in the record that would allow us to conclude that that finding was clearly erroneous.
 
 
 11
 The Double Jeopardy Clause[2] usually does not bar a retrial when the declaration of mistrial is prompted by the defense, as occurred in this case. Oregon v. Kennedy, 456 U.S. 667, 672-73 (1982). The rationale behind the rule is that by making a motion for a declaration of mistrial the defendant has waived his right to be tried in front of the jury currently impaneled in the case. In United States v. Dinitz, 424 U.S. 600 (1976), the Supreme Court held that a mistrial granted at the request of the defendant does not preclude retrial, except when the government has acted in bad faith. This exception was narrowed to circumstances where the prosecution or presiding judge deliberately attempted to "goad" the defendant into making such a motion. Kennedy, 456 U.S. at 674-76. Prosecutorial misconduct constituting "harassment or overreaching" must occur, but is not a sufficient condition for triggering the exception--the prosecutor must intend "to subvert the protections afforded by the Double Jeopardy Clause." Id. at 675-76. A finding regarding the intent of the prosecutor is a finding of fact relating to the "objective facts and circumstances" of each case. Id. at 675.
 
 
 12
 The magistrate judge correctly summarized the law of the Sixth Circuit since Kennedy:
 
 
 13
 The Sixth Circuit has restated the Kennedy test by indicating that only prosecutorial behavior which "was intentionally calculated to cause or invite mistrial" will bar retrial. United States v. Thomas, 728 F.2d 313, 318 (6th Cir.1984)....
 
 
 14
 In determining whether or not the requisite prosecutorial intent was present, a reviewing court may consider the following factors: 1) whether there was a "sequence of overreaching prior to the single prejudicial" incident; 2) whether the prosecutor resisted or was surprised by the defendant's motion for mistrial; and 3) the findings of the trial and appellate courts concerning the intent of the prosecutor. Kennedy, 456 U.S. at 680 (Powell, J., concurring); [ United States v.] White, 914 F.2d [747, 752 (6th Cir.1990) ].
 
 
 15
 In this case, the state trial court specifically found that there was no intent to goad the defense to move for a mistrial. The court must uphold this finding unless it clearly erroneous. Martin can point to no evidence that the state trial court's finding was clearly erroneous. As the state trial court properly found, the evidence in the case tended to show that the prosecutor's "Rogue's Gallery" comment, the precipitating cause of defense counsel's motion for a mistrial, was motivated by a frustration with alleged efforts by "defendant's people" to intimidate the witnesses. Martin's argument that the prosecution taunted him before the trial began, even if supported by state trial court findings below, which it is not, is not the kind of "goading" required by Kennedy. The same is true of the prosecutor's "shyster" remark, also not heard by the jury in the first trial. The prosecutor could make faces and "raspberries" at the defendant all day outside of the hearing of the jury without giving rise to constitutional defects in a defendant's trial. Such conduct would be unseemly, but not unconstitutional. Kennedy does not prohibit "goading" in some detached or general sense, but "goading" designed to force a mistrial. As the magistrate judge correctly noted, the taunting that Martin alleges occurred was not seen by the jury and therefore should not have pushed the defense to move for a mistrial.
 
 
 16
 Martin also implies that the prosecutor had a strong motive to engage in "goading" in this case because no witnesses, including the victim, were available to testify at the first trial. It is certainly true that Lane did not testify, but, as discussed above, Martin is simply incorrect in asserting that no witnesses testified for the prosecution at the first trial. Moreover, the state trial court expressed a willingness to allow the admission of previous written testimony by Lane. These facts seriously weaken Martin's attempt to impugn the prosecutor's motives in the first trial. Finally, Martin argues that he was denied the opportunity to present facts to the state trial court bearing on the prosecutor's motive in making the "Rogue's Gallery" remark. This may true, although it is not entirely clear from the trial transcript. However, nothing shows that Martin attempted to make this argument to the magistrate judge or to the district court. Martin could have urged the district court to make the factual findings he desired, but obviously did not choose to do so. In this circumstance, a remand for more fact-finding would not be appropriate.
 
 
 17
 Applying the three factors set out in White results in the same conclusion that Martin's double jeopardy argument is meritless. First, the "Rogue's Gallery" remark in front of the jury was isolated and not part of a prior pattern of overreaching. Second, the magistrate judge noted that the record was silent on the position taken by the prosecutor on Martin's motion for a mistrial, so this factor neither helps nor hurts Martin's "goading" argument. Finally and most decisively, the state trial court specifically found that the prosecutor did not intentionally attempt to "goad" Martin into moving for a mistrial. With two of the three White factors against him and none in his favor, we hold that trying Martin a second time did not violate the Double Jeopardy Clause.
 
 B. Confrontation Clause
 
 18
 Martin's argument from the Confrontation Clause[3] presents only a legal question and therefore is subject to de novo review in this § 2254 case. Cain v. Smith, 686 F.2d 374, 380 (6th Cir.1982) ("pure questions of law are not governed by Section 2254(d)['s standard of clear error review of state court factual determinations]"). Martin contends that he was denied his right to confront the witnesses against him in his second trial when the state trial court entered its exclusion order preventing his counsel from revealing to him the names and addresses of four particular witnesses and by preventing his counsel from divulging the same information in open court.
 
 
 19
 While the Confrontation Clause of the Sixth Amendment gives the defendant the right to cross-examine witnesses at a criminal trial, the trial judge possesses the discretion to limit the scope of that cross-examination. United States v. Christian, 786 F.2d 203, 213 (6th Cir.1986). " 'In determining whether a trial judge has abused his discretion in the curtailment of cross-examination of government witnesses, the test is whether the jury was already in possession of sufficient information to make a discriminating appraisal of the particular witness' possible motives for testifying falsely in favor of the government.' " Id. at 213 (quoting United States v. Singh, 628 F.2d 758, 763 (2d Cir.), cert. denied, 449 U.S. 1034 (1980)). Nevertheless, in Smith v. Illinois, 390 U.S. 129, 131 (1968) (quoting Pointer v. Texas, 380 U.S. 400, 404 (1965)), the Supreme Court had earlier stated, "the very starting point 'in exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself."[4] No specific showing of prejudice is required to demonstrate a violation of a defendant's rights under Smith to have access to a witness's name and address. Smith, 390 U.S. at 132. Still, there is no absolute right for a defendant to have a jury hear the true names and addresses of witnesses where the trial court determines there are legitimate concerns for the safety of a witness. Clark v. Ricketts, 958 F.2d 851, 855 (9th Cir.), cert. denied, 113 S.Ct. 17 (1992).[5] Resolving this case therefore depends on weighing the trial judge's proper discretion to limit the scope of a defendant's right of cross-examination against the defendant's limited rights of access to the names and addresses of the prosecution's witnesses. Justice White and Justice Marshall concurred, for instance, in Smith, noting that limitations on the defendant's confrontation rights in connection with the disclosure of witnesses' names and addresses are justified to protect the personal safety of those witnesses. Smith, 390 U.S. at 133-34 (White, J., concurring); Miller v. United States, 28 F.3d 1213, 1994 WL 329537, at ** 9 (6th Cir.1994) (unpublished per curiam) (citing Smith and Clark ).
 
 
 20
 The state trial court's exclusion order in this case was reasonably designed to protect the witnesses' safety. To the extent this was a futile act, it was because Martin already possessed the information that he claims he was deprived of. And to the extent it was a futile act, it did not harm Martin. Martin's defense counsel himself ironically conceded that the witnesses covered by the order were "known to everyone involved." Moreover, the most significant rationale behind the name and address disclosure rule is to ensure that the defense has an adequate opportunity to research the backgrounds of the witnesses and discover possible avenues for impeaching them. In this case, the judge's exclusion order forbade defense counsel only from revealing the name and address information in open court and to his client. It did not forbid defense counsel from obtaining or using the information himself for the purposes of investigation leading to material usable for impeachment purposes. Thus, Martin's defense was unaffected by the exclusion order.
 
 III
 
 21
 We AFFIRM the district court's order dismissing Martin's petition for habeas corpus.
 
 
 
 [1]
 It is not clear from the record or from the magistrate judge's report whether these four witnesses were the same four eyewitnesses who testified at the first trial, although this seems the likely conclusion. The magistrate judge may have been prevented from reaching this conclusion by the fact that the trial court granted the prosecution's exclusion order, thereby preventing any identifying information for these witnesses from being included in the trial transcript
 
 
 [2]
 "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life and limb...." U.S. Const. amend. V. The Double Jeopardy Clause was made applicable to the states by Benton v. Maryland, 395 U.S. 784, 794-96 (1969)
 
 
 [3]
 "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI
 
 
 [4]
 We limit our discussion of the rationale behind the name and address disclosure rule to the notion that it opens up avenues of investigation into the witness's credibility. As the magistrate judge noted, however, the Supreme Court may also have provided another rationale for this rule--that it "place[s] the witness in his proper setting" and is "an essential step in identifying the witness with his environment." Smith, 390 U.S. at 132. This passage from Smith could be read to suggest that a jury is entitled to rely on any prejudices it might have about people from the area where the witnesses live--an illegitimate consideration that seems to us plainly within the discretion of federal courts to restrict under Fed.R.Evid. 403 and state courts to restrict under state law analogs. In any event, Martin has no real argument that his confrontation rights were violated by not being allowed to reveal to the jury the milieus of the four relevant witnesses because it was already apparent to the jury that each of these four witnesses lived in the neighborhood where the beating took place
 
 
 [5]
 Clark does not discuss the particular safety concerns that prompted the state trial court in that case to prevent the disclosure of the Joe Doe witness's name and address. Nor does the state appellate opinion. See State v. Clark, 616 P.2d 888, 892 (Ariz.) ("The trial court inquired into the nature of the threat to the personal safety of John Doe, determined the threat was real...."), cert. denied, 449 U.S. 1067 (1980)